SURMAN v SURMAN

Docket No. 276615. Submitted October 9, 2007, at Grand Rapids. Decided December 4, 2007, at 9:05 a.m. Leave to appeal denied, 480 Mich 1138.

Joseph S. Surman was divorced from Jane Ann Surman in the Newaygo Circuit Court, Family Division. Joseph was granted physical custody of the parties' two minor children and Jane was granted reasonable parenting time. Five years later, Joseph brought an ex parte, pro per motion, seeking the suspension of Jane's parenting time because the parties' son was experiencing emotional distress allegedly caused by Jane's actions. The court, Graydon W. Dimkoff, J., entered an order on August 1, 2005, suspending Jane's parenting time until a show-cause hearing could be held. Jane brought a motion to rescind the August 1, 2005, order and requested an ex parte order awarding "temporary legal possessory custody" to her because of alleged child abuse by Joseph. The trial court entered an ex parte order on August 9, 2005, granting Jane's motion. The order allowed Joseph to have supervised parenting time. Joseph filed an objection to the August 9, 2005, order. The trial court, following a hearing, determined that the children should remain in Jane's custody until a trial could be held. In March 2006, Joseph moved to have the August 9, 2005, order declared void and for an equal division of parenting time. On March 23, 2006, the trial court denied the motion. In April 2006, Joseph filed a claim of appeal from the March 23, 2006, order. The Court of Appeals, WHITBECK, C.J., acting under MCR 7.203(F)(1) and 7.216(A)(10), dismissed the claim of appeal for lack of jurisdiction because the March 23, 2006, order is a postjudgment order that, unlike the August 9, 2005, order, does not affect the custody of a minor and therefore is not a "final order" from which an appeal as of right may be taken under MCR 7.202(6)(a)(iii). Unpublished order of the Court of Appeals, entered May 26, 2006 (Docket No. 269681). Joseph then filed a delayed application for leave to appeal the March 23, 2006, order and the Court of Appeals, MARKEY, P.J., and SAWYER and BANDSTRA, JJ., denied the application for failure to persuade the Court of the need for immediate appellate review. Unpublished order of the Court of Appeals, entered September 27, 2006 (Docket No. 270883). Following a trial in November and December 2006, the

trial court entered an order awarding Jane legal and physical custody of the children. Joseph appealed.

The Court of Appeals *held*:

1. The Court of Appeals lacks jurisdiction to address Joseph's challenges to the August 9, 2005, ex parte order. That order was a "final order" under MCR 7.202(6)(a)(iii) because it was a postjudgment order affecting the custody of a minor, and Joseph failed to timely file a claim of appeal from that order. There is no requirement that an order be a permanent order to fall within MCR 7.202(6)(a)(iii).

2. Although a court may conduct an in camera interview of a child involved in a child custody dispute, the interview is limited to determining the child's parental custody preference. When necessary to facilitate a trial court's assessment of a child's best interests, the court may allow the child to testify in court concerning the child's allegations of abuse. The trial court complied with MRE 601 in assessing on the record the competency of the parties' minor son to testify and did not abuse its discretion in allowing the child to testify with regard to the allegations of abuse.

3. The trial court complied with the requirements of MRE 702 in determining that the therapist who was treating the parties' son was competent to testify as an expert. The court did not abuse its discretion in admitting the expert's testimony.

Affirmed.

1. COURTS — JURISDICTION — APPEALS — ORDERS — CHILD CUSTODY.

The Court of Appeals has jurisdiction of an appeal of right filed by an aggrieved party from a final judgment or final order of the circuit court; a "final judgment" or "final order" in a domestic relations action is a postjudgment order that affects the custody of a minor; an order need not be a permanent order to qualify as a final judgment or a final order (MCR 7.202[6][a][iii]).

2. TRIAL — WITNESSES — CHILD CUSTODY — ALLEGATION OF ABUSE.

Testimony concerning a child's allegations of abuse by a parent is relevant to a trial court's child custody determination; a trial court may allow the child to testify in court regarding allegations of abuse in order to facilitate the court's assessment of the child's best interests during a child custody proceeding.

3. TRIAL — WITNESSES — EXPERT WITNESSES.

A trial court should not weigh a proffered witness's credibility in determining whether the witness is qualified as an expert; a trial

> court's doubts pertaining to credibility, or an opposing party's disagreement with an expert's opinion or interpretation of facts, are issues that relate to the weight to be given the testimony, and not its admissibility.

*Albuseiri & Boer, P.C.* (by *Mikhail Albuseiri* and *Karen M. Boer*), and *Roger W. Boer, PLLC* (by *Roger W. Boer*), for the plaintiff.

*Eardley Law Offices, P.C.* (by *Eugenie B. Eardley*), for the defendant.

Before: WHITBECK, C.J., and TALBOT and FORT HOOD, JJ.

PER CURIAM. Plaintiff Joseph S. Surman appeals as of right the trial court's order granting defendant Jane A. Surman custody of the couple's two minor children, Nicholas (born May 22, 1994) and Emily (born May 5, 1996). We affirm.

### I. BASIC FACTS AND PROCEDURAL HISTORY

Joseph Surman filed for divorce from Jane Surman in June 2000. Following trial, the trial court granted Joseph Surman physical custody of Nicholas and Emily, and allowed Jane Surman reasonable parenting time.

In August 2005, Joseph Surman brought an ex parte, pro per motion, asking the trial court to suspend Jane Surman's parenting time. Joseph Surman alleged that Nicholas was experiencing emotional distress because Jane Surman had told him to lie about Joseph Surman to Nicholas's counselor. According to the motion, Nicholas had been diagnosed with bipolar disorder and oppositional defiant disorder, and was taking medication and receiving psychological counseling. On August 1, 2005, the trial court entered the requested order, suspending Jane Surman's parenting time until a show-cause hearing could be held.

Jane Surman brought a motion to rescind the August 1, 2005, order and requested an ex parte order awarding "temporary legal possessory custody" of the children to her. Jane Surman argued that the allegations in Joseph Surman's motion were false. Jane Surman also alleged that Joseph Surman "was recently substantiated for child abuse" and attached a report from Child Protective Services (CPS). That report stated that Joseph Surman had allegedly hit Nicholas several times on March 13, 2005, and that pictures showed Nicholas had a bruise like a handprint on the right side of his face. Nicholas did not go to school for the next three days; the school was told that he was sick. Nicholas told the interviewer that he had never received bruises from his father before and that the punishments he usually received included being sent to his room, having to write sentences, getting a slap across the back of the head, or getting dish soap in his mouth. His sister Emily witnessed the March 13 incident and confirmed that Joseph Surman slapped Nicholas several times. Emily also described the same kinds of usual punishment as Nicholas had.

The interviewer met with Joseph Surman and his current wife, Maureen Surman. One of her sons from a previous marriage also witnessed the incident and said that Joseph Surman hit Nicholas in the face and Nicholas fell over an ottoman. Joseph Surman admitted slapping Nicholas on the side of the head but asserted that Nicholas got the bruises on his face from the fall. After some discussion with the interviewer, Joseph Surman agreed to participate in the Families First Program, which was designed to teach appropriate disciplining techniques. Also attached to Jane Surman's motion was a letter from Nicholas in which he said that the Families First Program did not work. He said that

his father cussed at him and used a belt to spank him. Nicholas stated that both he and his sister wanted to live with their mother.

On August 9, 2005, the trial court entered an ex parte order granting Jane Surman's motion. The trial court allowed Joseph Surman to have supervised parenting time. The trial court also reinstated counseling for Nicholas.

Joseph Surman filed an objection to the August 9, 2005, ex parte order and attached a letter from Nicholas saying that he had made exaggerations in his earlier letter and felt pressured by Jane Surman when he wrote the letter. Also attached to the objection was an investigation report from Families First that stated a finding that the risk to the children was low and that the case was closed. Following a hearing, the trial court ruled that the children remain in Jane Surman's custody until a trial could be held.

In March 2006, Joseph Surman filed a motion asking the trial court to declare void the August 9, 2005, order and asking that parenting time be split 50/50 between the parties until trial. During a hearing on the motion, Joseph Surman argued that the trial court should exclude the testimony of Kathy Palka, LLP, Nicholas's therapist, whom Jane Surman also intended to call as an expert witness, on the ground of bias because Palka had a relationship (professional and possibly personal) with Maureen Surman's ex-husband. Joseph Surman also argued that Nicholas's counseling with Palka should be discontinued.

The trial court stated that it was reluctant to rule on Kathy Palka's alleged partiality without taking testimony on the issue. The trial court justified its August 9, 2005, order by referring to the substantiated allegations of abuse, the reasonable inference that Joseph Sur-

man's motion to terminate all of Jane Surman's parenting time was an attempt to cover up abuse by Joseph Surman, and the fact that Joseph Surman had cut off Nicholas's counseling with Palka. The trial court also noted that, on the basis of its discussions with the children, it had determined that, at least for the time being, they were safest with Jane Surman. The trial court noted Joseph Surman's longstanding anger-management problem but also acknowledged evidence of Jane Surman's mental illness. The trial court concluded that it needed to have access to all the evidence that would be presented at a trial before it could change the existing parenting-time situation. On March 23, 2006, the trial court denied Joseph Surman's motion to declare void the August 9, 2005, order and denied Joseph Surman's motion to discontinue Palka's counseling services.

Joseph Surman moved for reconsideration of the trial court's ruling regarding Palka. Joseph Surman pointed out that the website for Palka's employer, Pine Rest Christian Mental Health Services, listed 46 different "specialties" for Palka, but, according to Joseph Surman, Palka lacked the requisite qualifications to actually be a specialist in any of the areas listed. Joseph Surman also stated that, as a limited-license practitioner, Palka was required to practice under the supervision of a licensed professional counselor,[1] yet the record lacked proof of such supervision. Joseph Surman requested that Palka's counseling of Nicholas be terminated. The trial court ordered that a court-appointed psychologist evaluate Nicholas.

In April 2006, Joseph Surman filed a claim of appeal from the March 23, 2006, order, but this Court dis-

---

[1] Citing MCL 333.18109.

missed the claim of appeal.[2] This Court explained that it lacked jurisdiction because "the March 23, 2006, order is a postjudgment order that does not affect the custody of a minor." According to this Court, "[i]t was the August 9, 2005, ex parte order for temporary custody that is the order affecting the custody of a minor. Untimely challenging that order and what occurred the next six months does not make the March 23, 2006, order an order affecting the custody of a minor." This Court stated that Joseph Surman could instead file a delayed application for leave to appeal.

In June 2006, Joseph Surman filed a delayed application for leave to appeal the March 23, 2006, order, but this Court denied the application "for failure to persuade the Court of the need for immediate appellate review."[3]

Following a four-day trial in November and December 2006, the trial court found clear and convincing evidence in support of the conclusion that Jane Surman should be awarded legal and physical custody of Nicholas and Emily.

## II. THE AUGUST 9, 2005, EX PARTE ORDER

Joseph Surman presents several challenges to the trial court's August 9, 2005, ex parte order, as well as the procedure by which that order was entered. However, we lack jurisdiction to address these claims.

This Court "has jurisdiction of an appeal of right filed by an aggrieved party from . . . [a] final judgment or

---

[2] Unpublished order of the Court of Appeals, entered May 26, 2006 (Docket No. 269681), citing MCR 7.202(6)(a)(i), MCR 7.202(6)(a)(iii), and MCR 7.203(A)(1).

[3] Unpublished order of the Court of Appeals, entered September 27, 2006 (Docket No. 270883).

final order of the circuit court . . . ."[4] MCR 7.202(6)(a)(iii) provides that, in a domestic relations action, the "final judgment" or "final order" means "a postjudgment order affecting the custody of a minor[.]" When a final order is entered, a claim of appeal from that order must be timely filed. A party cannot wait until the entry of a subsequent final order to untimely appeal an earlier final order.[5] There is no requirement under the court rule that it be a permanent order to fall within MCR 7.202(6)(a)(iii).

The August 9, 2005, order was a "final order" under MCR 7.202(6)(a)(iii) because it was a postjudgment order affecting the custody of a minor, and Joseph Surman failed to timely file a claim of appeal from that order. Accordingly, we conclude that Joseph Surman's challenges to the August 9, 2005, ex parte order are not properly before this Court.

### III. ADMISSIBILITY OF CHILD'S TESTIMONY IN CUSTODY CASE

#### A. STANDARD OF REVIEW

Joseph Surman argues that the trial court clearly erred in allowing Nicholas to testify in open court, especially in light of Nicholas's various mental illnesses and after the trial court already conducted two in camera interviews.

We must affirm custody orders on appeal unless the trial court's findings were against the great weight of the evidence, the court committed a palpable abuse of discretion, or the court made a clear legal error on a major issue.[6]

---

[4] MCR 7.203(A)(1).

[5] See *Klco v Dynamic Training Corp*, 192 Mich App 39, 41; 480 NW2d 596 (1991).

[6] MCL 722.28; *Harvey v Harvey*, 257 Mich App 278, 283; 668 NW2d 187 (2003), aff'd 470 Mich 186 (2004).

## B. RELEVANT FACTS

On the first day of trial, Joseph Surman's counsel objected to the presentation of Nicholas's testimony, arguing that he was a child of tender years. The trial court overruled the objection on the ground that a child may be called to testify in a custody matter where there is an allegation of abuse. Joseph Surman's counsel then countered that one slap did not rise to a level of abuse necessitating Nicholas's in-court testimony. The trial court instructed the parties to research the issue.

Joseph Surman filed a memorandum regarding the admissibility of Nicholas's testimony in court. Joseph Surman pointed out that *Molloy I*[7] made clear that in camera hearings were allowed but limited solely to the determination of the child's preference regarding custody. Joseph Surman noted that in *Breneman v Breneman*[8] this Court held that the trial court did not err in allowing a child to testify in open court regarding alleged abuse; however, Joseph Surman argued that *Molloy I* had modified or overruled *Breneman*.

Jane Surman responded that *Molloy I* did "not support a flat prohibition on testimony of a child . . . [,] rather the holding of *Molloy [I]*, is that that Court is prohibited from delving into areas other than the child's stated preference[.]" Jane Surman contended that, contrary to Joseph Surman's assertion, *Breneman* was still good law. Jane Surman noted that the *Breneman* Court specifically distinguished the child's testimony in court regarding abuse from an in camera discussion regarding his preference.

---

[7] *Molloy v Molloy*, 243 Mich App 595; 628 NW2d 587 (2000) (*Molloy I*), vacated in part 243 Mich App 801 (2001), rev'd 247 Mich App 348 (2001), aff'd in part and vac'd in part 466 Mich 852 (2002).

[8] *Breneman v Breneman*, 92 Mich App 336; 284 NW2d 804 (1979).

The trial court ruled in favor of Jane Surman and stated its intent to call Nicholas to testify regarding the abuse. The trial court clarified that Nicholas would not be allowed to testify in court regarding his parental preference, noting that it would be scheduling an in camera interview with both children to determine their preference.

On the last day of trial, Dr. James Van Treese was called to testify regarding his psychological evaluation of Nicholas. Jane Surman's counsel asked Dr. Van Treese for his opinion regarding whether testifying in court would be harmful or beneficial to Nicholas. Dr. Van Treese responded that he would prefer that Nicholas talk to the judge in chambers and not on the stand in front of his parents. On further questioning, Dr. Van Treese confirmed that, regardless of whether the interview took place in chambers or the courtroom, it would make sense for the parents not to be present and for the process to be "as informal as possible." But Dr. Van Treese later stated that "the best situation would be with the attorneys there so he knows that it is official[.]" Jane Surman's counsel suggested that, consistent with Dr. Van Treese's testimony, the trial court should take Nicholas's testimony in "open court," not necessarily in the courtroom, but in the presence of a court reporter for the purposes of making a record.

Upon questioning by Joseph Surman's counsel, Dr. Van Treese stated his preference that Nicholas not be called as a witness. However, on cross-examination, Dr. Van Treese indicated that, given the "constant push and pull between two parents . . . for years[,]" having Nicholas testify would not cause him undue trauma: "I wouldn't overly focus on him having another bad five minutes on the stand[.]" After further arguments by counsel on the issue, the trial court reiterated its ruling

that Nicholas would testify. The trial court ruled that Dr. Van Treese be allowed to remain in the courtroom during Nicholas's testimony.

Nicholas, who was 12 at the time of trial, was then called to testify at trial. Before any questioning by counsel, the trial court questioned Nicholas regarding the difference between lying and telling the truth, and discussed with him the need for justice, truth, and peace in society. The trial court concluded that Nicholas "knows the difference between right and wrong and that he does have a conscience and that he is thoroughly capable of testifying here today." Nicholas testified regarding the incident when his father slapped him. Nicholas testified that he was "freaked out" by the incident and that he never expected his father to "do a thing like that[,]" but he also testified that his father had previously hit him on the back of the head so hard that it made him cry, as well as pulled his ear and his hair, and called him a "little s——."

### C. APPLICABLE LAW

It is well established that to protect a child from the trauma and distress of choosing between his or her parents in open court, a trial court may exclude the child's parental preference testimony from trial and instead interview the child in camera.[9] But the subject

_____

[9] MCR 3.210(C)(5); *In re Leu*, 240 Mich 240, 249; 215 NW 384 (1927) (stating that in custody disputes it is "wise and considerate on the part of all to refrain from publicly pressing the child in open court by direct and cross-examination as a witness to take sides or make choice[s] between his parents"); *Molloy v Molloy*, 247 Mich App 348, 351; 637 NW2d 803 (2001) (*Molloy II*), aff'd in part and vac'd in part 466 Mich 852 (2002); *Impullitti v Impullitti*, 163 Mich App 507, 510; 415 NW2d 261 (1987) ("[B]y conducting an in camera conference with the child, which was limited to determining the child's preference and excluded discussion of other factors not germane to the custody dispute, the judge appropriately

of the in camera interview is strictly limited to determining the child's preference.[10]

In *Burghdoff v Burghdoff*, the plaintiff argued that the trial court erred by conducting an in camera interview with the child regarding his current living situation and his custody preference.[11] This Court noted that the scope of a court's in camera interview with a child during a custody proceeding had not yet been defined.[12] But after explaining that " 'the reasonable preference of the child' " was one of the many factors for the court to consider in a custody dispute,[13] this Court held that "sound policy" required that an in camera interview "be confined to those matters reasonably necessary to enable the circuit judge to determine and understand the preference of the child."[14] This Court explained that the court "should be particularly sensitive to the trauma that a custody proceeding often has for a child, because a child is often caught in the middle in a struggle between two parents, and forced to choose up sides when he does not want to do so."[15] This Court further explained, "[A] child who is the subject of a custody dispute, who most likely has already undergone the agony inherent in the breakup of a family unit, should not be subjected to the additional pain of having to testify in open court and be cross-examined as he would be if he were a witness in ordinary criminal or

---

protected the child from the trauma of choosing between her two parents in open court."); *Burghdoff v Burghdoff*, 66 Mich App 608, 612-613; 239 NW2d 679 (1976).

[10] MCR 3.210(C)(5); *Molloy II, supra* at 350; *Burghdoff, supra* at 612.

[11] *Burghdoff, supra* at 611.

[12] *Id.* at 612.

[13] See MCL 722.23(i).

[14] *Burghdoff, supra* at 612.

[15] *Id.* at 612-613.

civil litigation."[16] This Court also ruled that, although ultimately harmless, the lower court exceeded the scope and intent of the in camera interview by questioning the child concerning facts bearing on the parties' moral fitness.[17]

In *Breneman v Breneman*, the trial court permitted an 11-year-old boy to testify in court regarding several instances of abuse, including an incident when the defendant mother beat him with a paddle, an incident when his stepfather struck him with such force that he was knocked off a chair and onto the floor, and an incident when the defendant punched him in the nose.[18] The defendant appealed, relying on *Burghdoff* to argue that the trial court committed error requiring reversal by allowing the child to testify in contravention of the principle that a child in a custody dispute " 'should not be subjected to the additional pain of having to testify in open court and be cross-examined as he would be if he were a witness in ordinary criminal or civil litigation.' "[19] The *Breneman* Court disagreed that the stated principle was applicable to the facts presented, pointing out that the *Burghdoff* Court "stated the foregoing as it applied to matters concerning the preference of the child."[20] The *Breneman* Court found significant that the 11-year-old child

> was not called to testify in order for the trial judge to determine and understand his preference. He was called in order to give testimony concerning the alleged abuse and mistreatment inflicted upon him by his mother and stepfather. Since [the child] was the only witness with firsthand

---

[16] *Id.* at 613.

[17] *Id.* at 613-614.

[18] *Breneman, supra* at 340.

[19] *Id.* at 343, quoting *Burghdoff, supra* at 613.

[20] *Id.* at 343.

knowledge to give his point of view, the trial court did not err in allowing him to testify. The policy considerations of *Burghdoff*, *supra*, do not apply to the instant case.[21]

Without acknowledging *Breneman*, a later panel of this Court in *Hilliard v Schmidt* rejected the 1976 *Burghdoff* decision, holding instead that an in camera interview may extend beyond assessment of the child's preference to any matter relevant to the trial court's custody decision.[22] The *Hilliard* Court reasoned that the trial court should be able to obtain information from the children regarding other custody factors "without subjecting them to 'the additional distress resulting from cross-examination and testifying before the parents.' "[23]

Two years later, a different panel of this Court, in *Molloy I*, disagreed with the *Hilliard* decision, indicating that if not bound by the *Hilliard* decision,[24] it would instead "follow the line of cases limiting the scope of an in camera interview with a child in a child custody dispute to a determination of the child's preference regarding custody."[25] The *Molloy I* Court explained that "allowing the in camera interview to exceed the scope of ascertaining the child's preference could result in the due process violation that this Court has sought to avoid . . . [b]ecause the in camera interview is not on the record and there is no cross-examination, and often no other attorneys present[.]"[26] On this point, the *Molloy I* Court specifically noted the *Breneman* holding, stating as follows:

---

[21] *Id.*

[22] *Hilliard v Schmidt*, 231 Mich App 316, 320-321; 586 NW2d 263 (1998).

[23] *Id.* at 320, quoting *Lesauskis v Lesauskis*, 111 Mich App 811, 815; 314 NW2d 767 (1981).

[24] Citing MCR 7.215(H)(1), which has since been redesignated as (J)(1).

[25] *Molloy I, supra* at 602.

[26] *Id.* at 603.

>     See, e.g., *Breneman v Breneman*, 92 Mich App 336,
> 342-343; 284 NW2d 804 (1979), where this Court held
> that the trial court did not err in allowing the parties'
> eleven-year-old son to testify in open court because the
> child was called to testify with regard to the alleged
> abuse and mistreatment inflicted on him by his mother
> and stepfather. This Court in *Breneman* distinguished
> *Burghdoff* on the ground that an in camera interview
> was the desired process to question a child with regard to
> the child's preference only.[27]

The *Molloy I* Court further posited, "[A]llowing the trial court to use the in camera interview with regard to any or all of the best interest factors could insulate its findings from meaningful appellate review in a way that is actually detrimental to the best interests of the child."[28]

A special panel convened to resolve the *Hilliard/Molloy I* conflict definitively concluded that the subject of the in camera interview is limited solely to determining the child's parental preference.[29] The *Molloy II* conflict panel agreed with the *Molloy I* rationale that limiting the in camera interview to a determination of the child's preference avoided due process problems while protecting the child from the undue stress of having to choose sides in the presence of his or her parents.[30] The *Molloy II* panel cautioned, however, that "this enlightened and sensitive focus on the child's well-being should not permit courts to ignore issues of fundamental fairness in proceedings affecting a parent's custodial rights."[31] "The *in camera* interview with the child is not meant to be a reliable form of fact finding."[32]

---

[27] *Id.* at 603 n 2.

[28] *Id.* at 604.

[29] *Molloy II, supra* at 350, 351.

[30] *Id.* at 351, 356-357.

[31] *Id.* at 352.

[32] *Id.*

In 2004, MCR 3.210(C)(5) codified the *Molloy II* holding as follows:

> The court may interview the child privately to determine if the child is of sufficient age to express a preference regarding custody, and, if so, the reasonable preference of the child. The court shall focus the interview on these determinations, and the information received shall be applied only to the reasonable preference factor.

### D. ANALYSIS

As evidenced by the foregoing cases, Michigan courts have long protected children of divorcing parents from being pushed to the center of their parents' dispute by avoiding the taking of the child's testimony about parental preference in court. In light of this principle of protecting the child from undue stress, Joseph Surman argues that Nicholas should not have been called to testify in court regarding his allegations of abuse.

We disagree. First, *Molloy II* firmly established that the subject matter of the in camera interview be strictly limited to determining the child's preference. Second, neither caselaw nor court rule precludes a trial court from taking testimony in court regarding issues other than the child's preference. Indeed, caselaw, including *Burghdoff*, *Molloy II*, and specifically, *Breneman*, makes clear that a trial court must take testimony in open court on issues of abuse or mistreatment because to allow courts to discuss such matters during the in camera interview would constitute a due process violation. Stated differently, although courts should seek to avoid subjecting children to the distress and trauma resulting from testifying and being cross-examined in court, concerns over the child's welfare are outweighed when balanced against a parent's due process rights.

When dealing with issues such as abuse and mistreatment, the child will often be the only witness, other than the allegedly abusive parent, with firsthand knowledge of the incident.[33] Thus, testimony concerning a child's allegations of abuse is clearly relevant to the trial court's custody determination.[34] And, unlike when assessing testimony regarding the child's personal preference regarding which parent the child would rather reside, when assessing testimony of abuse the trial court is called upon to make credibility determinations, weigh the evidence, and, most importantly, resolve factual conflicts, all of which must be supported by the great weight of the evidence and subject to this Court's review.[35] Accordingly, when necessary to facilitate a trial court's assessment of the child's best interests, a trial court may call a child to testify in court concerning his or her allegations of abuse during a child custody proceeding.

Joseph Surman also argues that the trial court should not have interviewed Nicholas in court because he had been diagnosed with bipolar disorder and oppositional defiant disorder, and was taking medication and receiving psychological counseling. We disagree.

In *Breneman*, this Court, citing MRE 601,[36] held that "as a general rule an 11-year-old child is competent to

---

[33] See *Breneman, supra* at 343.

[34] See MCL 722.23.

[35] See *Molloy II, supra* at 351-355; *Molloy I, supra* at 603-604.

[36] MRE 601 states as follows:

Unless the court finds after questioning a person that the person does not have sufficient physical or mental capacity or sense of obligation to testify truthfully and understandably, every person is competent to be a witness except as otherwise provided in these rules.

testify ... unless the court finds after questioning a person that he does not have sufficient physical or mental capacity or sense of obligation to testify truthfully and understandably[.]"[37] Here, the trial court "specifically questioned the child to determine his competency and ability to tell the truth before it permitted him to testify."[38] Therefore, the trial court complied with MRE 601 by assessing Nicholas's competency on the record. Indeed, the trial court took additional safeguards to make sure the process was not coercive or threatening by soliciting the active participation of Dr. Van Treese.

We conclude, in keeping with *Breneman* and *Molloy II*, that the trial court did not abuse its discretion in permitting Nicholas to testify in court regarding his allegations of abuse by Joseph Surman.

### IV. ADMISSIBILITY OF CERTAIN EXPERT TESTIMONY

#### A. STANDARD OF REVIEW

Joseph Surman argues that the trial court committed clear legal error and abandoned its gate-keeping function when it allowed and relied on the testimony of Kathy Palka, LLP, Nicholas's therapist, in violation of MRE 702.

The preliminary determination of the qualification of an expert is an issue for the trial court to decide.[39] Thus, the qualification of a witness as an expert and the admissibility of the testimony of the witness are in the trial court's discretion and we will not reverse on appeal

---

[37] *Breneman, supra* at 343.

[38] *Id.* at 344.

[39] *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 780; 685 NW2d 391 (2004).

absent an abuse of that discretion.[40] An abuse of discretion exists if the decision results in an outcome outside the range of principled outcomes.[41]

## B. RELEVANT FACTS

Kathy Palka testified on behalf of Jane Surman. Palka testified that she was a psychologist with a limited license and with Master of Arts degrees in family life education, family counseling, and community counseling, and a masters specialty in substance abuse and addictions counseling. Palka testified that she also received a national board certification and was a licensed practicing counselor. Palka testified as follows regarding her areas of expertise:

> I have expertise in the area of family counseling; couples counseling; I am certified across the board in children; adolescent; adult; older adult counseling through an extensive credential process, which Pine Rest does, that actually physicians also have to meet the same criteria. It's based on education, training, as well as experience. I previously served as a guardian ad-litem and led Genuisee [sic] County's C-Can Program. I also did psychiatric inpatient as well as outpatient family parenting skills.

Palka confirmed that she was an expert in 44 different areas of expertise. And she stated that she had previously testified in "hundreds and hundreds" of court cases.

Upon questioning by the trial court, Palka confirmed that, with respect to Nicholas's case, she was exercising her expertise in family counseling and children/adolescent counseling. Palka stated that she had worked in the area of family counseling, counseling children and adolescents,

---

[40] *Woodard v Custer*, 476 Mich 545, 557; 719 NW2d 842 (2006).

[41] *Id.*

for 20 years and that, during that time, she had counseled
"thousands" of clients. The trial court asked Palka, "And
what degrees do you have that are directly relevant to
family counseling?" And Palka responded as follows:

> A masters in family life education and counseling, which is
> counseling across the lifespan, with a special emphasis on
> parent/family relationships; as well as child/family relation-
> ships; as well as parenting relationships. I also have a great
> deal of education in the area of psychotherapy/psychology, as
> well as compassing the entire lifespan. As well as community
> psych, which embraces the severe and persistent mental
> health issues in relation to families, individuals, and the
> community.

The trial court asked Palka, "And what degrees do you
have that are particularly relevant to the counseling of
children and adolescents?" to which Palka responded,
"The master in family life education of counseling
across the lifespan, as well as psychology and commu-
nity therapy." The exchange between the trial court and
Palka continued as follows:

> *The Court*: Aside from those two areas of expertise did
> you exercise any other area of expertise in dealing with
> Nicholas Surman, for which you perhaps should be quali-
> fied in order to testify here today?
>
> *Ms. Palka*: I also have an extensive knowledge of child
> abuse and neglect from serving as a [guardian ad litem] for
> Genesee County through the—
>
> *The Court*: —How many years?
>
> *Ms. Palka*: Three years through the probate court
> system.
>
> *The Court*: Did any of your degrees assist you, help
> educate you with regard to that counseling?
>
> *Ms. Palka*: Yes, the family life education counseling
> across the lifespan, as well as conferences and independent
> training to continue CEU's, to obtain and secure licensing
> as required by law.

The trial court clarified that Palka did not intend to testify that she performed a psychological examination of Nicholas, rather she simply intended to testify regarding her "initial assessment and continued counseling based on a treatment plan." The trial court then stated:

> I think education is the key word. This lady has as much education or more than many people who have been well qualified and have testified before this court primarily on the basis of long experience. Certainly the 20 years alone that she has been experienced in these matters, that is particularly family counseling, children/adolescent counseling, and abuse/neglect proceedings or counseling, she's well qualified in all three matters, and the Court accepts those qualifications and her expertise in those matters.

On cross-examination, Palka testified that she has treated over 6,000 clients/patients since she obtained her dual master's degrees in either 1996 or 1997. Palka testified that because she worked at a nonprofit agency she was not required to be supervised by a Ph.D., but she noted that a psychiatrist supervised her. Palka testified that she had appeared in three other cases within the last year; however, Palka refused to disclose the names of the cases, claiming that such disclosure would violate the Health Insurance Portability and Accountability Act.[42] Palka could only recall the name of one judge before whom she testified as an expert witness.

Joseph Surman states in his brief that Palka never provided a curriculum vitae to the court. However, the record reveals that a copy of her curriculum vitae was entered as an exhibit during trial.

### C. ANALYSIS

MRE 702 governs the admission of expert testimony and provides:

---

[42]  42 USC 1320d *et seq.*

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The admission of expert testimony requires that (1) the witness be an expert, (2) there are facts in evidence that require or are subject to examination and analysis by a competent expert, and (3) the knowledge is in a particular area that belongs more to an expert than to the common man.[43] The party presenting the expert bears the burden of persuading the trial court that the expert has the necessary qualifications and specialized knowledge that will aid the fact-finder in understanding the evidence or determining a fact in issue.[44] A witness may be qualified as an expert by knowledge, skill, experience, training, or education.[45]

Joseph Surman argues that the trial court committed clear legal error and abandoned its gate-keeping function when it allowed and relied on the testimony of Kathy Palka, LLP, Nicholas's therapist, in violation of MRE 702. More specifically, Joseph Surman contends that Palka grossly overstated her qualifications and that such overstatement disqualified her from testifying with any degree of authority. Accordingly, the apparent gravamen of Joseph Surman's argument against

---

[43] *King v Taylor Chrysler-Plymouth, Inc*, 184 Mich App 204, 215; 457 NW2d 42 (1990).

[44] *Davis v Link, Inc*, 195 Mich App 70, 74; 489 NW2d 103 (1992).

[45] MRE 702; *Mulholland v DEC Int'l Corp*, 432 Mich 395, 403; 443 NW2d 340 (1989).

Palka's testimony is that she lacked the qualifications necessary to be an expert witness in this case.

The record clearly reflects that the trial court extensively questioned Palka regarding her educational and occupational background, and elicited specific testimony concerning her qualifications to testify regarding the specific issues in this case—family counseling, children/adolescent counseling, and child abuse and neglect. Therefore, we cannot conclude that the trial court failed to comply with MRE 702.

With respect to Joseph Surman's argument that Palka overstated her qualifications, we first note that Joseph Surman fails to offer any proof that Palka was untruthful in her testimony. Absent any such evidence, this Court should generally presume that her testimony was truthful. "[W]hen citizens have been sworn to tell the truth, . . . the initial presumption is that they are honoring their oath and are being truthful."[46] Moreover, when determining whether a witness is qualified as an expert, the trial court should not weigh the proffered witness's credibility.[47] Rather, a trial court's doubts pertaining to credibility, or an opposing party's disagreement with an expert's opinion or interpretation of facts, present issues regarding the weight to be given the testimony, and not its admissibility.[48] " 'Gaps or weaknesses in the witness' expertise are a fit subject for cross-examination, and go to the weight of his testimony, not its admissibility.' "[49] The extent of a witness's

---

[46] *People v DeLisle*, 202 Mich App 658, 663; 509 NW2d 885 (1993).

[47] *Attorney General v Ankersen*, 148 Mich App 524, 551; 385 NW2d 658 (1986).

[48] *Bouverette v Westinghouse Electric Corp*, 245 Mich App 391, 401; 628 NW2d 86 (2001); *Ankersen, supra.*

[49] *Wischmeyer v Schanz*, 449 Mich 469, 480; 536 NW2d 760 (1995), quoting *People v Gambrell*, 429 Mich 401, 408; 415 NW2d 202 (1987).

expertise is usually for the jury to decide.[50] Therefore, to the extent that Joseph Surman believed that Palka was overstating or exaggerating her qualifications, cross-examination was the proper avenue to attempt to invalidate those qualifications.

Accordingly, we conclude that the trial court did not abuse its discretion by admitting Palka's expert testimony.

Affirmed.

---

[50] *People v Whitfield*, 425 Mich 116, 123-124; 388 NW2d 206 (1986).