*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MICHELLE KLAPP,

       Plaintiff-Appellant,

v

BEAUMONT HEALTH, also known as
BEAUMONT BOTSFORD OAKWOOD HEALTH,
INC., OAKWOOD HEALTHCARE, INC., also
known as BEAUMONT HOSPITAL-DEARBORN,
OAKWOOD HOSPITAL AND MEDICAL
CENTER, OAKWOOD HOSPITAL, OAKWOOD
HEALTHCARE SYSTEM, OAKWOOD
HOSPITAL-DEARBORN, JONATHAN
LEISCHNER, DO, PRIORITY MEDICAL CARE,
PLLC, JONATHAN LESICHNER, DO, PC,
JONATHAN SORINI, DO, LAUREN E.
CHIPMAN, RN, and ANITA M HICKSON, RN,

       Defendants-Appellees.

UNPUBLISHED
May 23, 2024

No. 364827
Wayne Circuit Court
LC No. 21-002192-NH

Before: BORRELLO, P.J., and SWARTZLE and YOUNG, JJ.

PER CURIAM.

Plaintiff suffered a stroke and went to Oakwood Hospital for treatment. Some stroke patients receive a particular type of treatment called "tissue plasminogen activator" or "tPA", but plaintiff did not receive this treatment. Believing that she should have received the treatment, plaintiff sued defendants for medical negligence. The trial court excluded plaintiff's proposed expert witness on causation and granted defendants' motion for summary disposition. We affirm.

## I. BACKGROUND

On May 28, 2019, plaintiff, who was 49 years old at the time, was at work. Between 2:00 p.m. and 2:30 p.m., plaintiff began to experience difficulty gripping a pen and writing. Plaintiff

arrived at Oakwood Hospital at 3:36 p.m., and she was admitted as an emergency patient at 3:50 p.m. At approximately 3:55 p.m., defendants Lauren Chipman, R.N., and Dr. Jonathan Leischner, D.O., evaluated plaintiff. Plaintiff reported the sudden hand numbness that occurred at approximately 2:00 p.m. Defendant Chipman observed plaintiff to have a strong grip, clear speech, no facial droop, and that she had been "very hypertensive in triage." Dr. Leischner observed that plaintiff had "no weakness," and he ordered imaging, laboratory tests, and medications. Defendants noted that plaintiff had not been taking her blood-pressure medication. At approximately 5:30 p.m., plaintiff underwent a noncontrasted CT scan, which did not show any abnormalities.

Defendant Dr. Jonathan Sorini, D.O., examined plaintiff at approximately 7:20 p.m. Dr. Sorini noted that plaintiff had a history of high-blood pressure and diabetes and that plaintiff's symptoms had gone away and returned after arriving at the hospital. At 7:50 p.m., Dr. Sorini discussed with plaintiff the administration of tPA. Dr. Sorini discussed this with another physician, however, who is not a defendant in this case, and determined that plaintiff was no longer a tPA candidate. Plaintiff's weakness progressed into the following morning, and she was ultimately diagnosed as having had an acute left subcortical ischemic stroke.

Plaintiff sued defendants, alleging medical malpractice against all defendants related to their failure to administer tPA to plaintiff. Along with her complaint, plaintiff included an affidavit from Dr. Michael F. Brin, D.O., in which he opined that breaches in the standard of care were, "more likely than not, the direct and proximate cause" of plaintiff's injuries. Dr. Brin further opined "[t]hat the lost opportunity to achieve a better result due to the above stated breaches of the standard of care was greater than fifty (50%) percent." In a subsequent deposition, Dr. Brin stated that "an accumulation of understanding and education" was the basis of his opinion. During his deposition, Dr. Brin made clear that his focus was on standard of care. When asked, he made mention of causation, but he did not rely on any studies or other research.

Throughout the proceedings in the lower court, several physicians testified about how tPA works and when it is used. In support of the theory that defendants' failure to administer tPA to plaintiff caused her injury, plaintiff offered the expert testimony of Dr. Nicholas Suite, M.D., who is a neurologist and internist. Dr. Suite exclusively cited a 1996 publication supporting a clinical trial authored by Genentech, the manufacturer that first brought tPA to market ("the Genentech study"). Dr. Suite relied on a chart within the Genentech study that showed that, among the subgroup of those studied who were aged 25 to 56 and received tPA, 34 out of 53 of the people within that age range achieved a good outcome. Dr. Suite opined, accordingly, that because plaintiff was 49 years old when she had her stroke, she would have had a greater than 50% chance of a good outcome if she had received tPA. Dr. Suite agreed that, across the entire spectrum of patients receiving tPA, there was between a 30% to 35% chance that tPA administration would achieve a good result. At the end of his deposition, Dr. Suite clarified that he did not rely on the Genentech study, or any other specific medical literature, to form his opinion.

Defendants offered the expert-opinion testimony of neurologist Dr. Seemant Chaturvedi, M.D. Dr. Chaturvedi testified at a deposition that, when doctors are discussing tPA administration with a patient, they tell the patient that out of 100 people who receive tPA, 32 will have a good outcome, three will have a bad outcome, and 65 will see no effect. Dr. Chaturvedi explained that the efficacy of tPA administration decreases after approximately three hours from the onset of

stroke symptoms because blood clots harden quickly. In the first three hours after stroke symptoms begin, a patient has a 30% to 35% chance of a good outcome following tPA administration. After three to four-and-a-half hours have passed since the onset of stroke symptoms, the efficacy of tPA falls to about 15%, and the window to administer tPA closes four-and-a-half hours after the onset of symptoms.

Dr. Chaturvedi disagreed with literature positing that there were subgroups of patients who had a greater than 50% chance of achieving a good result from the administration of tPA and stated that "most experts" would state that there was between a 30% to 40% chance of a good outcome from tPA administration. Dr. Chaturvedi additionally opined that younger patients are more likely to achieve a better outcome following a stroke regardless of whether tPA was administered.

Discovery closed on August 31, 2022. On October 3, 2022, plaintiff filed a supplemental witness list, which added neurologist Dr. Werner Hacke to plaintiff's expert witness list.

On October 4, 2022, defendants moved for summary disposition under MCR 2.116(C)(10) or, alternatively, for a *Daubert*[1] hearing addressing the admissibility of Dr. Suite's expert testimony under MRE 702 and MCL 600.2955(1). Defendants argued that the testimony of Dr. Suite could not form a sufficient basis for plaintiff to establish the element of causation in her medical-malpractice claim, which requires showing that, more probably than not, defendants caused plaintiff's injury. Defendants argued that Dr. Suite formed his opinion that plaintiff had a 64% chance of a better outcome on the basis of one subgroup in one study, but other subgroups in that study showed a less than 50% chance of achieving a better outcome, including in female patients like plaintiff. Further, there had been "copious amounts" of other randomized controlled trials, and none showed that tPA administration more likely than not resulted in a good outcome. Accordingly, defendants argued that plaintiff could not establish causation.

Plaintiff argued in response that she could establish causation without showing a loss of a chance for a better outcome because she could establish, instead, that she lost an opportunity for a cure. Second, plaintiff argued that she could establish causation because the opinion of Dr. Hacke established that plaintiff lost a more than 50% chance of a better outcome by not receiving tPA. Finally, plaintiff argued that a *Daubert* hearing was unnecessary because the medical literature and opinions of Dr. Suite, Dr. Chaturvedi, and Dr. Hacke established that plaintiff would have had approximately a higher than 50% chance of a better outcome if she had been administered tPA.

Defendants moved to strike plaintiff's amended witness list on the basis that it was submitted months after the deadline for such lists as well as the close of discovery. Plaintiff responded that defendants did not promptly object to the filing of the amended witness list or attempt to depose Dr. Hacke. Further, plaintiff argued that defendants cited Dr. Hacke in their motion for summary disposition and that the addition of Dr. Hacke constituted good cause in response to the issues that defendants raised in their motion. Importantly, plaintiff did not rely on Dr. Brin in her response to defendants' motion for summary disposition, which was focused on causation, but instead relied on Dr. Hacke and Dr. Suite. Similarly, plaintiff did not mention Dr.

---

[1] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

Brin with regard to causation in either her response to defendants' motion to strike plaintiff's supplemental witness list or in the hearing on defendants' motion for summary disposition.

The trial court held a hearing on defendants' motions. Defendants stated that, in December 2021, the only causation expert that plaintiff provided was Dr. Suite. Defendants argued that Dr. Suite's conclusion that plaintiff had a 64% of a better outcome with the administration of tPA was unreliable because the same study showed that only 41% of women achieved a better outcome after receiving tPA. Further, defendants argued that Dr. Suite's opinions ignored that all studies concluded that the administration of tPA has approximately a 30-to-35% chance of resulting in a better outcome. Finally, defendants argued that such percentages of causing a better outcome could not establish the element of causation in either a traditional medical-malpractice claim or a loss-of-opportunity claim.

Plaintiff argued that the medical literature considered a successful tPA administration as a cure, rather than as a better or worse outcome, and that plaintiff would have had a 64% chance of a good outcome (or "cure") with the timely administration of tPA. Plaintiff also argued that plaintiff's lost opportunity for a cure cannot be measured against a placebo group because she did not receive a placebo, and her symptoms did not improve. In reply, defendants argued that plaintiff relied on a subgroup of only 53 patients, while plaintiff also fell into the subgroup of the same study that included 137 female patients, and which showed that, more likely than not, plaintiff would not have benefited from tPA administration. Further, the meta-analysis showed that 32.9% of patients receiving tPA had a good outcome.

At the hearing, the trial court granted defendants' motion to strike Dr. Hacke's inclusion on plaintiff's witness list. The trial court subsequently issued an opinion and order granting summary disposition in favor of defendants. The trial court stated that it was not considering Dr. Hacke's affidavit because it was inadmissible and relied on methodology that Dr. Suite did not use. In regard to Dr. Suite's testimony, the trial court first determined that expert-medical testimony would assist the trier of fact and that Dr. Suite was an expert under MRE 702. The trial court then made findings on each of the seven factors for determining the admissibility of expert medical testimony under MCL 600.2955(1).

The trial court determined that the first two factors favored the admissibility of Dr. Suite's testimony, but the final five factors did not. The trial court determined that, under the third factor, MCL 600.2955(1)(c), Dr. Suite's reliance on only the age subgroup from the Genentech study did not meet generally accepted standards because it was too small of a sample size compared to the meta-analysis of studies that defendants introduced as evidence. To reach the conclusion that plaintiff had a 64% chance of achieving a good outcome with tPA administration, Dr. Suite relied on the evidence that 34 out of 53 study participants in the Genentech study who were between 25 and 56 years old had a good outcome. In contrast, the trial court reasoned, the meta-analysis study, which included 6,756 participants, concluded that 32.9% of participants had a good outcome after receiving tPA. Further, eight studies following the Genentech study showed a less than 50% chance of patients receiving tPA having a good outcome.

Next, the trial court determined that, under the fourth factor, MCL 600.2955(1)(d), there was a known error rate of Dr. Suite's opinion because eight other studies contradicted Dr. Suite's testimony that it was more likely than not that plaintiff would have had a good outcome following

tPA administration. Under the fifth factor, MCL 600.2955(1)(e), the trial court found that Dr. Suite's opinion and the basis for his opinion were not generally accepted within the relevant expert community. Under the sixth factor, MCL 600.2955(1)(f), the trial court found that for other experts to rely on the same basis that Dr. Suite did and reach the same opinion, they would have to isolate the single factor of age, and that to do so would not be reliable. Finally, under the seventh factor, MCL 600.2955(1)(g), the trial court found that Dr. Suite's opinion and his methodology for the opinion were not relied upon outside the context of litigation.

The trial court concluded that even if plaintiff established all of the factual assertions in her complaint, there was no reliable literature that supported the proposition that she would have been 50% more likely to achieve a better result with the timely administration of tPA. Further, because Dr. Suite's testimony was inadmissible, plaintiff had failed to provide expert testimony on causation as was required for her medical-malpractice claim. Therefore, the trial court found that there was no genuine issue of material fact and granted defendants' motion for summary disposition.

Plaintiff now appeals.

II. ANALYSIS
A. EXPERT WITNESS TESTIMONY

Plaintiff first argues that the trial court erred by striking Dr. Suite's opinion. We review for an abuse of discretion a trial court's decision concerning the admissibility of proposed expert witness testimony. *Surman v Surman*, 277 Mich App 287, 304-305; 745 NW2d 802 (2007). "An abuse of discretion exists if the decision results in an outcome outside the range of principled outcomes." *Id*. at 305.

MRE 702 imposes on the trial court a gatekeeping function for the admission of expert-opinion testimony and imposes "an obligation on the trial court to ensure that any expert testimony admitted at trial is reliable." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 779-780; 685 NW2d 391 (2004). "The reliability of the expert's testimony is to be determined by the *judge* in advance of its admission—not by the jury at the conclusion of the trial by evaluating the testimony of competing expert witnesses." *Tobin v Providence Hosp*, 244 Mich App 626, 651; 624 NW2d 548 (2001). At the time that this case was decided, MRE 702 stated:[2]

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliability to the facts of the case.

---

[2] The Michigan Rules of Evidence were amended on September 20, 2023, effective January 1, 2024.

The proposed expert testimony "must serve to give the trier of fact a better understanding of the evidence or assist in determining a fact in issue." *Craig ex rel Craig v Oakwood Hosp*, 471 Mich 67, 79; 684 NW2d 296 (2004) (cleaned up). A trial court must "ensure that each aspect of an expert witness's testimony, including the underlying data and methodology, is reliable." *Elher v Misra*, 499 Mich 11, 22; 878 NW2d 790 (2016). "Careful vetting of all aspects of expert testimony is especially important when an expert provides testimony about causation." *Gilbert*, 470 Mich at 782. The party offering an expert's testimony "bears the burden of proving that the contested opinion is based on generally accepted methodology." *Craig ex rel Craig*, 471 Mich at 83. Although a lack of literature to support a proposed expert's testimony is not necessarily dispositive, it "is an important factor in determining the admissibility of expert witness testimony." *Edry v Adelman*, 486 Mich 634, 640; 786 NW2d 567 (2010).

MCL 600.2955(1) provides that, in an action for an injury to a person:

a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

(a) Whether the opinion and its basis have been subjected to scientific testing and replication.

(b) Whether the opinion and its basis have been subjected to peer review publication.

(c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

With respect to causation, plaintiff offered below the expert opinions of two physicians, Dr. Hacke and Dr. Suite. With respect to Dr. Hacke, the trial court ruled that his testimony was inadmissible, and plaintiff does not challenge that decision on appeal.

Turning to Dr. Suite's opinion, plaintiff did not offer any arguments in the trial court about the specific factors listed in MCL 600.2955(1). Even so, the trial court addressed each factor, and we discern no error in its analysis. First, the trial court did not err by finding that, under the third factor, MCL 600.2955(1)(c), Dr. Suite's reliance on a single age subgroup from the Genentech study did not meet generally accepted standards when the subgroup included only 53 individuals. Plaintiff argues that Dr. Suite relied on generally accepted methods and that an expert applying education, experience, and training to the facts of a case is a generally accepted standard. Plaintiff does not, however, offer any evidence to show that experts in the field would similarly select and apply data from a small subgroup to the particular facts of a case or that reliance on such a small sample size is a generally accepted standard for interpreting and applying the data on the efficacy of tPA administration. Moreover, there was no evidence offered to justify why age was an appropriate trait to isolate by subgroup, as opposed to other subgroup traits like sex, medical history, etc.

Likewise, the trial court did not err by concluding that the fourth factor, MCL 600.2955(1)(d), weighed against admissibility of Dr. Suite's testimony because Dr. Suite's assertion of a 64% chance of success stood in stark contrast to the meta-analysis that showed that tPA administration never showed a success rate above 50%. Plaintiff argues on appeal that the data on which she relies had an error rate of less than 5%, but plaintiff does not rely on any record evidence for this assertion, and she did not make an argument on this factor at the trial court.

Next, the trial court did not err by finding that the fifth factor, MCL 600.2955(1)(e), weighed against admissibility. The trial court concluded that Dr. Suite's opinion was not accepted within the relevant expert community because the guidelines used for explaining the risks and benefits of tPA administration, which are standardized and used across the United States, state that there is a 32% to 35% chance that tPA administration will be successful. The trial court further relied on eight other studies and a meta-analysis showing that tPA administration is not more likely than not to result in a good outcome. There is no basis on this record to find that the trial court erred in its determination.

The trial court likewise did not err by finding, when considering the sixth factor, MCL 600.2955(1)(f), that the basis of an opinion made by an expert relying on a similar methodology to the one that Dr. Suite used would not be reliable because of the shortcomings in the methodology. Plaintiff argues that Dr. Suite's opinions are reliable because other medical professionals have published papers that are consistent with Dr. Suite's opinions in this case. But, in fact, plaintiff has not pointed this Court to any studies that support Dr. Suite's opinion that a person in plaintiff's position would have a 64% chance of a positive outcome following tPA administration under the circumstances present here.

Finally, the trial court did not err by concluding that, under MCL 600.2955(1)(g), Dr. Suite's opinions and methodology were not relied upon by experts outside of the context of litigation. The published literature consistently shows that tPA administration is effective 30% to 35% of the time. Plaintiff has shown that there are occasional data points that possibly support Dr. Suite's opinions, but it is not particularly surprising to see outlier data in any robust study. Simply put, plaintiff has not pointed to any study that concludes, with a statistically relevant confidence level, that there is a better-than-even chance of a successful outcome after tPA administration. Accordingly, the trial court did not abuse its discretion when it ruled that Dr. Suite's expert testimony was inadmissible. See *Surman*, 277 Mich App at 304-305.

## B. SUMMARY DISPOSITION

We turn next to the trial court's grant of summary disposition to defendants. "We review de novo a trial court's decision to grant or deny a motion for summary disposition." *Sherman v City of St Joseph*, 332 Mich App 626, 632; 957 NW2d 838 (2020) (citations omitted). "When deciding a motion for summary disposition under MCR 2.116(C)(10), we consider the evidence submitted in a light most favorable to the nonmoving party." *Payne v Payne*, 338 Mich App 265, 274; 979 NW2d 706 (2021). "Summary disposition is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Sherman*, 332 Mich App at 632.

To succeed on a medical-malpractice claim, a plaintiff must establish: "(1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. Failure to prove any of these elements is fatal." *Cox ex rel Cox v Bd of Hosp Managers for City of Flint*, 467 Mich 1, 10; 651 NW2d 356 (2002). For a medical-malpractice claim, expert testimony is required to establish the element of causation. *Kalaj v Khan*, 295 Mich App 420, 429; 820 NW2d 223 (2012).

There are two ways to prove causation on a medical-malpractice claim. *Benigni v Alsawah*, 343 Mich App 200, 209-210; 996 NW2d 821 (2022). First, MCL 600.2912a(2) provides that a plaintiff must establish that he or she "suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants." This is a traditional medical-malpractice claim. *Id.* at 210. The next sentence of MCL 600.2912a(2) provides that a plaintiff "cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%." This type of "loss-of-opportunity" claim requires a plaintiff to show that a "defendant's malpractice resulted in a loss of opportunity greater than 50 percentage points." *Id.* This Court looks "to the gravamen of the pleaded facts to discern whether a case presents a traditional malpractice or loss-of-opportunity claim." *Id.* at 212.

The parties disagree on whether plaintiff is pursuing an ordinary medical-malpractice claim or a "loss-of-opportunity" claim. It is not particularly clear to this Court whether plaintiff is pursuing one or both of the theories, but, in any event, it is not necessary to nail this down. Under either theory, plaintiff must still show a genuine issue of material fact on causation. And, as explained in the prior section, plaintiff has no expert opinion on causation— (1) the trial court struck the opinion of Dr. Hacke as untimely and plaintiff does not challenge this on appeal; and (2) the trial court did not abuse its discretion when it struck the opinion of Dr. Suite as unreliable.

As to Dr. Brin, although plaintiff relies on appeal on several statements made by Dr. Brin, plaintiff failed to rely on Dr. Brin's causation views below when defendants challenged plaintiff on causation. It is improper to raise these new facts on appeal when it was plaintiff's burden to establish in the trial court that a genuine issue of material fact existed in regard to causation. See *Walters v Nadell*, 481 Mich 377, 388; 751 NW2d 431 (2008); *Quinto v Cross and Peters Co*, 451 Mich 358, 362-363; 547 NW2d 314 (1996).

Plaintiff points to various studies that she claims support her theory of causation. For example, she cites the Genentech subgroup, but this is the same cherry-picked analysis that the trial court properly rejected in its review of the opinion of Dr. Suite. Plaintiff also argues that,

because there were purportedly two windows of time during which she should have been administered tPA, the Court should multiple the 35% chance of a single good outcome by two, to arrive at a 70% chance of an overall good outcome. Even if this Court assumes there were, in fact, two windows during which defendants could have administered the drug to plaintiff, there is nothing in the record to suggest that it would be proper to multiply the chance of a good outcome from a particular stroke episode by the number of opportunities to administer the drug during that episode. In fact, doing so would lead to the absurd result that if, for example, there were four such windows of time, then under plaintiff's reasoning, she would have had a 140% chance of a good outcome.

Without expert testimony on causation, plaintiff cannot advance a viable claim of medical malpractice, whether a traditional claim or a "loss-of-opportunity" claim. See *Kalaj*, 295 Mich App at 429. Because the trial court did not abuse its discretion in striking the opinion of Dr. Suite, plaintiff cannot show a genuine issue of material fact on causation, and, therefore, summary disposition in favor of defendants was appropriate.

Affirmed. As the prevailing parties on appeal, defendants may tax costs. MCR 7.219(A).

/s/ Stephen L. Borrello
/s/ Brock A. Swartzle
/s/ Adrienne N. Young