*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

AUSTIN LASKOS,

       Plaintiff-Appellee,

v

JEFFERY MARK MAPLES,

       Defendant,

and

CHARTER TOWNSHIP OF PLYMOUTH,

       Defendant-Appellant.

UNPUBLISHED
May 25, 2023

No. 360350
Wayne Circuit Court
LC No. 20-002999-NI

Before: RICK, P.J., and SHAPIRO and O'BRIEN, JJ.

PER CURIAM.

In this automobile negligence action, defendant, the Charter Township of Plymouth (hereinafter referred to as "the Township"), appeals as of right the trial court's order denying its motion for summary disposition. Because the trial court properly determined that there were questions of fact regarding the applicability of the motor vehicle exception to governmental immunity, MCL 691.1405, we affirm.

## I. BACKGROUND

This action arises out of injuries sustained by 24-year-old plaintiff Austin Laskos. Plaintiff was riding his bicycle when he was struck by a Ford Expedition operated by Plymouth Township Police Officer Jeffery Mark Maples. The accident occurred at the intersection of Ann Arbor Road and Marlowe Avenue. Ann Arbor Road runs east and west, whereas Marlowe Avenue runs north and south. Marlowe Avenue terminates at Ann Arbor Road, and the only traffic control device for the T-shaped intersection is a stop sign at northbound Marlowe Avenue. Maples was operating the vehicle in the scope of his duty as a police officer, and was driving northbound on Marlowe Avenue. Plaintiff was riding his bike westbound on a sidewalk that runs along the south side of

-1-

Ann Arbor Road. Although the parties have vastly different recollections of the events leading to plaintiff's injuries, it is undisputed that Maples and plaintiff collided in a nonmarked crosswalk on Marlowe Avenue, at the intersection with Ann Arbor Road.

Following the accident, plaintiff filed this third-party no-fault action against Maples and the Township. Plaintiff alleged he sustained injuries to his neck, lumbar spine, and left leg. Plaintiff claimed that these injuries constituted a serious impairment of body function in excess of the no-fault threshold. In response, defendants jointly moved for summary disposition under MCR 2.116(C)(7) (claim barred by operation of law) and (10) (no genuine issue of material fact). They primarily argued that they were shielded by governmental immunity under the governmental tort liability act (GTLA), MCL 691.1401 *et seq.* More specifically, defendants argued that plaintiff had failed to show that Maples negligently operated the SUV, and that neither the Township nor Maples could thus be held liable under the GTLA. Defendants also argued that the record established that plaintiff was more than 50% at fault for the accident. In addition, defendants contended that plaintiff's injuries were not caused by the June 20, 2019 events, and provided evidence that plaintiff had a long history of lower back pain, likely exacerbated by multiple falls from a BMX bike and a 2018 rollover automobile accident. Further, defendants argued that plaintiff's lumbar spine issues, including a herniated disc, developed months after the accident, following intensive chiropractic treatment.

Plaintiff responded by arguing that summary disposition was precluded because questions of fact existed regarding who was at fault and whether Maples's actions either caused plaintiff's alleged injuries or exacerbated a preexisting condition. Plaintiff also argued that questions of fact existed regarding whether plaintiff suffered a serious impairment of a body function.

Following a hearing on the motion, the trial court granted defendants' motion for summary disposition in part and denied it in part. The court granted the motion with respect to plaintiff's gross negligence claim against Maples and dismissed Maples from the case. However, the court found that there were genuine issues of material fact regarding whether Maples operated his vehicle negligently, as well as whether Maples's alleged negligence was a proximate cause of plaintiff's injuries. The court also found that there were questions of fact regarding whether plaintiff's actions caused or contributed to his injuries. Therefore, the trial court denied the Township's motion. Later, the court also denied a motion for reconsideration filed by the Township. This appeal followed.

## II. ANALYSIS

### A. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision regarding a motion for summary disposition. *Grady v Wambach*, 339 Mich App 325, 329; 984 NW2d 463 (2021). "A motion for summary disposition pursuant to MCR 2.116(C)(7) tests whether a claim is barred because of immunity granted by law, and requires consideration of all documentary evidence filed or submitted by the parties." *Miller v Lord*, 262 Mich App 640, 643; 686 NW2d 800 (2004) (quotation marks and citation omitted). The applicability of governmental immunity and its statutory exceptions are reviewed de novo. *Moraccini v Sterling Hts*, 296 Mich App 387, 391; 822 NW2d 799 (2012). "If the facts are not in dispute and reasonable minds could not differ

concerning the legal effect of those facts, whether a claim is barred by immunity is a question for the court to decide as a matter of law." *Poppen v Tovey*, 256 Mich App 351, 354; 664 NW2d 269 (2003) (citation omitted).

A motion under MCR 2.116(C)(10) tests the factual sufficiency of a claim. *Johnson v VanderKooi*, 502 Mich 751, 761; 918 NW2d 785 (2018). When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion. *Id.* A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact. *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 5; 890 NW2d 344 (2016). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Johnson*, 502 Mich at 761 (quotation marks, citation, and brackets omitted in original).

### B. NEGLIGENCE

In general, a governmental agency is immune from tort liability if it is engaged in the exercise or discharge of a governmental function. MCL 691.1407(1). However, governmental immunity is subject to six narrowly drawn statutory exceptions. *Lash v Traverse City*, 479 Mich 180, 195 n 33; 735 NW2d 628 (2007). The exception relevant to this case is the motor vehicle exception, which provides:

> Governmental agencies shall be liable for bodily injury and property damage resulting from the negligent operation by any officer, agent, or employee of the governmental agency, of a motor vehicle of which the governmental agency is owner, as defined in Act No. 300 of the Public Acts of 1949, as amended, being sections 257.1 to 257.923 of the Compiled Laws of 1948. [MCL 691.1405.]

Moreover, MCL 691.1405 must be read in conjunction with the no-fault act, MCL 500.3101 *et seq.* Specifically, the restrictions on damages recoverable in third-party tort actions involving motor vehicle accidents set forth in MCL 500.3135 of the no-fault act apply to cases permitted by the waiver of governmental immunity provided for in the motor vehicle exception. *Hannay v Dep't of Transp*, 497 Mich 45, 51; 860 NW2d 67 (2014). Accordingly, a plaintiff may bring a third-party tort action for economic and noneconomic damages against a governmental agency if the requirements of MCL 500.3135 are met. *Id.* In this regard, the no-fault act places certain limits on tort liability for injuries sustained in motor vehicle accidents. *McCormick v Carrier*, 487 Mich 180, 189; 795 NW2d 517 (2010). Under MCL 500.3135(1), a person remains subject to tort liability for noneconomic loss caused by the ownership, maintenance, or use of a motor vehicle if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement. However, a party is not allowed to recover noneconomic damages if they are found to be more than 50% at fault. Specifically, MCL 500.3135(2)(b) provides: "Damages must be assessed on the basis of comparative fault, except damages must not be assessed in favor of a party who is more than 50% at fault."

The Township argues that it is entitled to governmental immunity under the GTLA because Maples did not negligently operate his patrol SUV. Alternatively, the Township argues that plaintiff is precluded from recovering damages because he was more than 50% at fault for the accident. We conclude that the trial court did not err by denying summary disposition to the

Township after finding that there were genuine issues of material fact regarding the issues of negligence and comparative fault.

The relative negligence of the parties is ordinarily a question for the trier of fact. *Poch v Anderson*, 229 Mich App 40, 51; 580 NW2d 456 (1998). To prove negligence, a plaintiff must prove that the defendant owed the plaintiff a duty of care, that the defendant breached that duty, that the plaintiff was injured, and that the defendant's breach caused the plaintiff's injuries. *Henry v Dow Chem Co*, 473 Mich 63, 71-72; 701 NW2d 684 (2005). Under the common law, the operator of a motor vehicle owes a duty to pedestrians to exercise due care. *Sweet v Ringwelski*, 362 Mich 138, 148; 106 NW2d 742 (1961). At the same time, a pedestrian "must take such care for his own safety as a reasonable, careful, prudent person would do under similar circumstances." *Malone v Vining*, 313 Mich 315, 321; 21 NW2d 144 (1946) (quotation marks and citation omitted).

Both parties also cite MCL 257.649(8) and the Mich Admin Code, R 28.1702, to further define the nature of their respective obligations. MCL 257.649(8) instructs a driver where to stop his vehicle at a stop sign:

> Except when directed to proceed by a police officer, the driver of a vehicle approaching a stop intersection indicated by a stop sign shall stop before entering the crosswalk on the near side of the intersection, or if there is not a crosswalk shall stop at a clearly marked stop line; or if there is not a crosswalk or a clearly marked stop line, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway. After having stopped, the driver shall yield the right of way to a vehicle that has entered the intersection from another highway or that is approaching so closely on the highway as to constitute an immediate hazard during the time when the driver would be moving across or within the intersection.

Notably, no markings are required for an area to be considered a crosswalk. See MCL 257.10.[1] Michigan's Administrative Code addresses the applicable duty assumed by a driver who encounters a pedestrian in a crosswalk or approaching a crosswalk. Mich Admin Code, R 28.1702 provides:

> When traffic-control signals are not in place or are not in operation, the driver of a vehicle shall yield the right-of-way, slowing down or stopping if need be to so yield, to a pedestrian crossing the roadway within a crosswalk when the

---

[1] MCL 257.10 defines a crosswalk as follows:

> "Cross-walk" means: (a) That part of a roadway at an intersection included within the connections of the lateral lines of the sidewalks on opposite sides of the highway measured from the curbs, or in the absence of curbs from the edges of the traversable highway.

> (b) Any portion of a highway at an intersection or elsewhere distinctly indicated for pedestrian crossing by lines or other markings on the surface.

-4-

pedestrian is on the half of the roadway on which the vehicle is traveling or when the pedestrian is approaching so closely from the opposite half of the roadway as to be in danger, but a pedestrian shall not suddenly leave a curb or other place of safety and walk or run into a path of a vehicle that is so close that it is impossible for the driver to yield.

Thus, under Rule 28.1702, a driver who sees a pedestrian in a crosswalk must yield the right-of-way. Further, a bicyclist and a pedestrian are similarly situated. Pursuant to MCL 257.660c, "[a]n individual lawfully operating a bicycle upon a sidewalk or a pedestrian crosswalk has all of the rights and responsibilities applicable to a pedestrian using that sidewalk or crosswalk." In Michigan, a violation of a statute creates a rebuttable presumption of negligence. *Johnson v Bobbie's Party Store*, 189 Mich App 652, 661; 473 NW2d 796 (1991).

Plaintiff and Maples were both deposed during discovery. Plaintiff testified that on the morning of June 20, 2019, he was riding his bicycle to Plymouth Pub, where he was employed as a cook. The 12-mile bike ride usually took approximately 45 minutes. Because of traffic conditions, plaintiff rode on the south sidewalk of westbound Ann Arbor Road. Earlier that morning, it was rainy and overcast, but plaintiff stated that the weather had cleared and the sun was out near the time he approached the intersection of Ann Arbor Road and Marlowe Avenue. Plaintiff was scheduled to report to work around 9:00 a.m., but he had the flexibility to arrive any time before 10:00 a.m.

Plaintiff explained that as he rode westbound on the sidewalk adjacent to Ann Arbor Road, approaching the intersection with Marlowe Avenue, he "glimpsed" the SUV to the south. The SUV would have been in the distance and it appeared to be coming to a stop or stopped. Plaintiff briefly hit his brake, looked, and noticed that the vehicle was coming to what he believed was a stop. Plaintiff estimated that the SUV was 10 to 15 feet away, maybe even more. However, plaintiff was certain that the SUV was not actually sitting at the stop sign. According to plaintiff, there was no vehicle stopped at the stop sign on Marlowe Avenue when he entered the crosswalk. Had there been, plaintiff would have waited before entering the road. As plaintiff entered the road he noticed movement to his left. At this point, the SUV struck plaintiff. Plaintiff believed that he was thrown a couple of feet before he and the bike fell to the ground. He assumed that he was hit by the solid steel push bar on the front of the SUV's bumper, probably more toward the driver's side of the bumper, and reached this conclusion because he was thrown to that side. Using the bike as a crutch, plaintiff stood up and propped himself on his bike. After the impact, Maples said little to plaintiff. The first thing he did say, however, was, "You bailed nicely."

In contrast, Maples testified that on the day in question, he was traveling northbound on Marlowe Avenue, intending to turn right onto Ann Arbor Road. Maples explained that he stopped at the stop sign at the intersection and then began to work on his mounted computer. He could not recall how long he was stopped, but GPS data indicated that he was stopped for 2 minutes and 22 seconds. Maples did not put the vehicle into park. When asked how the accident happened, Maples explained:

I was working on my computer after stopping at the stop sign. When I got done looking at the computer I looked up, there's nobody in front of me, there's a building to my left, it's an old insurance building, and I was creeping forward to

see around the building, see who was coming from the west, and your client hit my vehicle with his bicycle. I never saw him.

Maples further testified that he looked forward and then looked to the left to see if cars were coming. He claimed that he heard "the noise" before he had a chance to look to the right. Maples admitted that there were no crosswalk lines on the road, but that plaintiff was riding his bike where a crosswalk would be. Maples was not sure that plaintiff had the right-of-way because he was going the wrong way on the crosswalk.

Maples agreed that because he never saw plaintiff, he did not know what plaintiff was doing before the contact. However, he still believed that plaintiff was rushing because he said he was late for work. Maples also agreed that a person had a duty to make sure a crosswalk is clear before entering it and that this was the reason pedestrians had the right-of-way. He then asserted that when he looked up, no one was in the crosswalk. Maples further testified that he did not strike plaintiff, but rather that plaintiff rode into the side of the SUV. He acknowledged that the SUV was moving, but "barely." When asked if anything obstructed his view, Maples asserted that the rain on his window and the A-pillar could have prevented him from seeing plaintiff. Maples denied that he was looking down at his computer at the time of the impact, but admitted that he was looking at it before the accident.

Maples testified that plaintiff made contact with the SUV's push bumper. When asked where on the bumper, Maples explained that from his perspective, it would have been on the right. Later, Maples testified that plaintiff's bicycle was fully in the street when the impact occurred. After he exited the SUV, Maples tried to defuse the situation with humor. He admitted that at some point, he told plaintiff that "he bounces well or something to that effect."

Maples received a written reprimand as a result of the June 20, 2019 incident. The reprimand found him at fault for the accident. When asked if he agreed with the findings, Maples replied, "I signed the paper, so yes." At his deposition, however, Maples believed that both he and plaintiff were each 50% at fault. He also believed that dark, rainy weather conditions contributed to the accident.

After the accident, Maples called his sergeant and they met up at the Plymouth Pub. During a conversation with plaintiff at the pub, Maples admitted that the accident was "totally" his fault. During his deposition, Maples explained that those statements were made when he was trying to calm plaintiff down and he had not had time to think about the accident completely.

While they were in the pub's parking lot, Maples's supervisor, Sergeant Todd Seipenko, arrived. Seipenko's dash-cam recorded Maples's conversation with Seipenko. Maples agreed that, in the videorecording, he can be heard saying that the crash was totally his fault and explaining, "I'm either looking at the screen or something else and then there he was."

Seipenko performed a "minor" investigation of the June 20, 2019 accident. The Michigan State Police (MSP) were the primary investigators. The MSP found that Maples was at fault for failing to yield. Seipenko simply incorporated this finding into his report. At the time of his deposition, Seipenko explained that despite the findings in his report made on the day of the accident, he no longer held the opinion that Maples was responsible for the accident. He now

believed that both plaintiff and Maples were at fault for failing to yield. Eventually, however, Seipenko concluded that Maples was 51% at fault for the accident. Seipenko believed that he had originally missed some details. Seipenko also explained that if a vehicle is stopped at a stop sign, a pedestrian or bicyclist has the right to continue their path across the roadway. Accordingly, if plaintiff were entering the crosswalk and a vehicle began to more forward, that vehicle would be failing to give the right-of-way.

The foregoing evidence clearly establishes a question of fact with respect to whether Maples was negligent in the operation of the SUV. Viewing the evidence in a light most favorable to plaintiff, a trier of fact could find that Maples was distracted and not paying attention to the roadway as he proceeded into the intersection. Some evidence substantiates that plaintiff fully occupied the crosswalk at the time Maples moved forward with the intent to make a right turn. Thus, based on the evidence presented, a reasonable trier of fact could conclude that Maples failed to yield the right-of-way to plaintiff, and that Maples violated his duty to maintain a reasonable lookout for bicyclists crossing in a location where he should have expected to see them. By contrast, based on Maples's testimony that plaintiff's bike struck the side of the SUV, a trier of fact could find that plaintiff left the curb and entered the unmarked crosswalk after Maples was already moving forward in the intersection to prepare to make his right turn.

The submitted evidence gave rise to at least three triable issues: (1) whether Maples's actions were reasonable under the circumstances, (2) whether plaintiff's actions were reasonable, and (3) if both were negligent, the percentage of fault attributable to each. Because Maples and plaintiff gave differing versions of the accident, the resolution of these questions depends largely on the credibility of the witnesses. Issues of witness credibility and the weight to assign a witness's testimony are typically issues for the fact-finder to resolve. *Barnes v 21st Century Premier Ins Co*, 334 Mich App 531, 540; 965 NW2d 121 (2020). Moreover, plaintiff presented evidence that Maples made statements on the day of the accident admitting that the accident was totally his fault. Maples agreed with the findings in his written reprimand, which found him at fault for the accident. This evidence supports the trial court's finding that there were questions of fact regarding whether Maples was negligent and whether he was more than 50% at fault for the accident. Accordingly, the Township has failed to demonstrate that it was entitled to summary disposition.

## C. CAUSATION

The Township next argues that the trial court erred when it determined that there was a question of fact regarding whether plaintiff's injuries were caused by the accident.[2] We disagree.

---

[2] We reject plaintiff's claim that this Court does not have jurisdiction to consider the Township's arguments regarding whether plaintiff's injuries were caused by the June 2019 accident and whether the injuries met the no-fault threshold because those arguments are beyond the scope of this appeal. Under MCR 7.203(A)(1), this Court has "jurisdiction of an appeal of right" from a "final judgment or final order of the circuit court," which includes "an order denying governmental immunity to a governmental party . . . under MCR 2.116(C)(7) or an order denying a motion for summary disposition under MCR 2.116(C)(10) based on a claim of governmental immunity,"

The Township separates plaintiff's injuries into three general categories: (1) the lumbar spine, (2) the cervical spine, and (3) the left leg, knee, and hip. For all of the alleged injuries, the Township argues that plaintiff failed to present evidence to explain how the impact could have resulted in injures of this nature. Regarding the lumbar and cervical spine, the Township asserts that because preaccident medical records document the same complaints as post-accident medical records, there is no evidence that plaintiff's spine sustained any injury.

"Proximate causation is a required element of a negligence claim." *Patrick v Turkelson*, 322 Mich App 595, 616; 913 NW2d 369 (2018). Causation is generally reserved for the trier of fact unless there is no dispute as to a material fact. *Id*. To establish proximate cause, a plaintiff must prove that both a cause in fact and a legal cause exist. *Weymers v Khera*, 454 Mich 639, 647; 563 NW2d 647 (1997). Michigan courts often use the term "proximate cause" as " 'a broader term referring to factual causation and legal causation together and as a narrower term referring only to legal causation.' " *Patrick*, 322 Mich App at 616, quoting *Ray v Swager*, 501 Mich 52, 63; 903 NW2d 366 (2017). This broader characterization recognizes that "a court must find that the defendant's negligence was a cause in fact of the plaintiff's injuries before it can hold that the defendant's negligence was the proximate or legal cause of those injuries." *Ray*, 501 Mich at 63-64 (quotation marks and citation omitted).

To establish cause in fact, a plaintiff must "present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Weymers*, 454 Mich at 647 (quotation marks and citation omitted). Causation cannot be established by mere speculation. *Patrick*, 322 Mich App at 617. A plaintiff's evidence of causation is sufficient to survive summary disposition if the evidence "establishes a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, although other plausible theories may also have evidentiary support." *Wilson v Alpena Co Rd Comm*, 263 Mich App 141, 150; 687 NW2d 380 (2004) (quotation marks and citation omitted).

The Township argues that, as a matter of law, plaintiff could not establish that he suffered any injury because he had preexisting conditions for which he received treatment before the June 2019 accident. However, "[r]egardless of the preexisting condition, recovery is allowed if the trauma caused by the accident triggered symptoms from that condition." *Wilkinson v Lee*, 463 Mich 388, 395; 617 NW2d 305 (2000). Our de novo review of the entire record confirms that a genuine issue of material fact exists regarding whether, as a result of the June 2019 accident, plaintiff suffered an objectively manifested impairment or worsening of a preexisting condition.

---

MCR 7.202(6)(a)(v). Although an appeal from an order described in MCR 7.202(6)(a)(v) "is limited to the portion of the order with respect to which there is an appeal of right," MCR 7.203(A)(1), "whenever the effect [of the trial court's order" is to deny a defendant's claim of immunity, the trial court's decision is, in fact, " 'an order denying governmental immunity.' " *Walsh v Taylor*, 263 Mich App 618, 625; 689 NW2d 506 (2004). Under MCL 691.1405, the Township is liable only if plaintiff's injuries resulted from the negligent operation of a motor vehicle. In finding that a question of fact existed regarding the cause of plaintiff's injuries, the trial court was rejecting the Township's claim of governmental immunity. Thus, this Court has jurisdiction to consider the Township's arguments.

The lower court record includes medical documents for treatment that preceded the June 20, 2019 accident. On September 25, 2017, plaintiff presented to Dr. Elisa Kolk, with BMC Internal Medicine, complaining of pain in his lumbar spine. He did not report any precipitating event, such as a hard fall or heavy lifting. He also did not complain of any leg pain, numbness, paresis (weakness precipitated by nerve damage), or paresthesias (tingling or prickling). Upon physical examination, Dr. Kolk found everything "normal" with the left hip, left knee, and left ankle. Regarding the lumbar spine, Dr. Kolk noted "decreased range of motion (decreased flexion, extension), pain and spasm." On October 2, 2017, plaintiff presented to TLC Chiropractic Care with complaints of pain in his left shoulder, neck, and mid and lower back. Plaintiff reported a history of several falls on a BMX bike. X-rays taken on October 2, 2017, showed disc degeneration and osteoarthritis at L5-S1, and disc wedging at L5-S1. Plaintiff visited TLC Chiropractic on 10 occasions between October 2, 2017 and November 13, 2017.

On April 19, 2018, plaintiff was involved in a rollover accident. The MSP accident report noted that plaintiff's condition after the accident "appeared normal." The following day, plaintiff presented to the emergency room at Henry Ford Hospital with complaints of neck, left hip, and left shoulder pain. Plaintiff apparently reported that, after the accident, he was able to crawl out of the car and was ambulatory at the scene. Plaintiff did not report any back pain. Upon physical examination, there was cervical tenderness at C1. An abrasion was noted on plaintiff's left shoulder. X-rays of the left hip and shoulder were unremarkable for fracture or dislocation. A CT of the cervical spine showed normal alignment with no fractures. Plaintiff was offered muscle relaxers, which he declined, stating that the pain was tolerable. Plaintiff testified at his deposition that after this 2018 accident, he was able to walk home from the hospital. Plaintiff also testified that he did not miss any work following the April 2018 events.

After the rollover event on April 19, 2018, there is nothing in the lower court record suggesting that respondent received any treatment for back, neck, or leg pain during the 14 months between the rollover and the accident at issue in this case. There is nothing in the record to undermine the conclusion that plaintiff's back issues had resolved or were asymptomatic. Indeed, at the time of the June 2019 accident, plaintiff was employed full time at the Plymouth Pub. Further, for several weeks preceding the accident, plaintiff was riding his bike to work because his car was out of commission. He was physically able to ride the 12-mile distance to his employment several times a week. He traveled that distance in approximately 45 minutes.

After the June 20, 2019 accident, plaintiff declined medical treatment at the scene. However, both Maples and his supervisor heard plaintiff state that he was hurt. Plaintiff explained during his deposition that he could not afford to incur the expense of an ambulance ride to the hospital.[3] Later that night, however, plaintiff sought treatment at Beaumont-Botsford Hospital.

---

[3] The inability to afford transportation by ambulance is an unfortunate reality for many Michigan residents, both with and without medical insurance. Those with insurance may have a ground ambulance ride paid for in full or in part, but may still end up paying upwards of $450 in surprise fees if the company that provides the ride is out of network. Ted Roelofs, *Michigan Ended Surprise Medical Bills, but Left Out Ground Ambulances*, <https://www.bridgemi.com/michigan-health-watch/michigan-ended-surprise-medical-bills-left-out-ground-ambulances> (accessed

According to the medical records, plaintiff's chief complaint was pain in his left femur, hip, and knee. Plaintiff denied any pain in the neck, back, and abdomen. A 4 x 8 cm contusion was noted on the left lateral femur. A CT scan of the left femur showed no evidence of fracture, subluxation, or dislocation. Upon discharge, it was recommended that plaintiff follow up with an orthopedist, Dr. Kelley J. Brossy.

Plaintiff testified that on the day after the accident, he was hardly able to move. On June 21, 2019, plaintiff sought treatment from Dr. Alex Rodnick, a chiropractor. At this first visit, plaintiff reported that since the accident, he had experienced neck, back, and left hip pain, as well as pain in his left knee and left shoulder. The pain was constant, but worsened with bending, twisting, or walking. The pain radiated down the left leg. X-rays taken at the chiropractic clinic of the cervical, thoracic, and lumbar spine showed disc wedging at L5-SI. Plaintiff treated with Dr. Rodnick approximately three times a week between June 21, 2019 and December 2, 2019. Plaintiff testified that he was not receiving "full-on" adjustments, just very light procedures, because of the severity of his condition.

In addition to the chiropractic treatment, plaintiff also sought treatment with Dr. Brossy, a general orthopedist employed with Michigan Orthopedic Specialists. During his first visit on July 3, 2019, plaintiff reported sharp, throbbing pain. Dr. Brossy noted swelling, bruising, weakness, and numbness in the left thigh. Physical therapy was ordered to improve plaintiff's strength and range of motion. At a follow-up appointment on August 7, 2019, plaintiff reported lower back pain that shot down the back of his left leg. Dr. Brossy ordered additional radiographic imaging. An MRI of the left hip, taken on August 15, 2019, was unremarkable. However, an MRI of the lumbar spine showed a disc herniation at L5-S1, with disc extrusion contacting both SI nerve roots as they exit the thecal sac. The MRI of the left knee, also taken on August 15, 2019, showed no evidence of ligamentous or meniscal injury. However, a contusion of the medial femoral condyle was noted, as well as moderate patellar chondromalacia (breakdown of cartilage). In light of the finding of a herniated disc at L5-S1, Dr. Brossy referred plaintiff to Dr. Rakesh Ramakrishnan, the spine specialist within the practice. It was unclear to Dr. Brossy whether the back condition was contributing to plaintiff's leg pain.

Plaintiff's first appointment with Dr. Ramakrishnan was on September 19, 2019. Dr. Ramakrishnan recommended a conservative treatment plan that included physical therapy, a home exercise program, and prescription anti-inflammatories. In October 2019, plaintiff responded poorly to an epidural steroid injection at L5-S1. An MRI of the cervical spine, performed on October 24, 2019, showed a small disc bulge at C3-C4. When conservative measures failed to improve plaintiff's back pain, Dr. Ramakrishnan recommended proceeding with surgery. On December 20, 2019, Dr. Ramakrishnan performed a lumbar discectomy and laminotomy at levels

---

April 26, 2023). For those without insurance, the cost can be astronomical, with some emergency medical service companies charging approximately $940 for an ambulance ride with basic life support services, and $1,277 for advanced life support services. FAIR Health, *Ground Ambulance Services in the United States: A Study of Private Healthcare Claims*, < https://s3.amazonaws.com/media2.fairhealth.org/whitepaper/asset/> (accessed April 26, 2023).

L5-SI.  In late January 2020, plaintiff resumed physical therapy and a home exercise program.  He was restricted from lifting anything greater than 20 pounds.

On March 30, 2020, plaintiff reported to Dr. Ramakrishnan that a recent epidural steroid injection had not provided him any pain relief.  While he continued to participate in physical therapy, the activity was difficult because of the pain.  Respondent reported that he was unable to perform many activities of daily living.  At this March 30, 2020 appointment, Dr. Ramakrishnan discussed with plaintiff that because of such a large disc herniation, it was likely that the disc had continued to worsen from the initial injury.  Plaintiff was only 24 years old at the time, and in light of plaintiff's young age, spinal fusion surgery was discussed as an option of "last resort."

When plaintiff's condition did not improve in the subsequent months, the decision was made to undergo a two-part spinal fusion surgery in June 2020.  Part one of the surgical procedure was performed on June 11, 2020; part two was completed on June 24, 2020.  By March 2021, plaintiff reported resolution of the leg pain, but he still reported left hip and back pain.  Physical therapy twice a week was helping, but plaintiff was still not released to return to work.  Plaintiff continued to require the use of a back brace and assistive devices for ambulation.  He also continued to have antalgic gait (an abnormal walking pattern usually causing a limp), severe pain, muscular weakness, and stiffness.  Dr. Ramakrishnan opined that because of plaintiff's young age and the nature of the injury, it was likely that plaintiff would experience "adjacent level degeneration above the fusion," which might lead to additional surgeries in the future.  Plaintiff testified that Dr. Ramakrishnan thought the surgeries went well, but he cautioned plaintiff that he would be unable to continue his previous lifestyle.  Plaintiff was told he would never be 100 percent.

We agree that plaintiff's testimony, his medical records, and the affidavit of his treating orthopedic surgeon, Dr. Ramakrishnan, established a question of fact whether the accident caused plaintiff's injuries.  In his affidavit, Dr. Ramakrishnan averred that he was a board-certified orthopedic surgeon, fellowship-trained in orthopedic spine surgery.  He first examined plaintiff on September 19, 2019, three months after the accident.  Contrary to the Township's claim that Dr. Ramakrishnan believed that a high-speed collision was involved, the doctor simply stated in the affidavit his belief that plaintiff was "struck on the left side by a truck while crossing a street in a crosswalk."  Dr. Ramakrishnan also understood that plaintiff began feeling low back pain "following the crash that he rated a 9-10 out of 10 that was sharp and stabbing and was coupled with radicular leg pain that was also a 9-10 out of 10."  Plaintiff also reported that he was experiencing balance issues, difficulty with his fine motor skills, and difficulty standing for long periods.  Dr. Ramakrishnan's affidavit includes a recitation of the treatment provided, including performing a discectomy and laminectomy at L5-S1 in December 2019, and a spinal fusion in June 2020.  Dr. Ramakrishnan stated that he had reviewed plaintiff's medical records from before and after the June 2019 accident and that he was aware that plaintiff received some chiropractic treatment in 2017.  Dr. Ramakrishnan then opined:

> Based on my education, my training, my clinical examinations, my review of his records before and after the crash, the imaging and the patient history, it is my opinion to a reasonable degree of medical certainty Mr. Laskos sustained injuries to his lower back specifically at the L5-S1 level and his neck at the C3-C4 level and the cause of those injuries is the truck colliding with Mr. Laskos.  As such,

it is also my opinion that the injuries described herein to Mr. Laskos' neck and back and the medical treatment that I have provided to Mr. Laskos, after the collision, including the surgeries I performed, are all directly related to the truck striking Mr. Laskos.

Viewing the record evidence in the light most favorable to plaintiff, a jury could reasonably conclude that even if plaintiff had some degree of a preexisting condition in the lumbar region of his spine before the accident, the condition had stabilized. A jury could also reasonably conclude that, after the June 2019 accident, the condition worsened, causing plaintiff severe pain requiring medical treatment and, eventually, surgery. That plaintiff did not appear injured at the time of the accident is not dispositive, and that he began to experience significant pain later in the day showed a "logical sequence of cause and effect," rather than a mere coincidental relationship. See *Patrick*, 322 Mich App at 620. Considering the submitted evidence, a reasonable jury could conclude that it was more likely than not that plaintiff would not have suffered injuries to his left leg or any aggravation to a preexisting lower back condition if not for Maples's conduct. Accordingly, the trial court correctly found that questions of fact remained, and therefore did not err when it denied the Township's motion for summary disposition.

We reject the Township's argument that it is improper to consider Dr. Ramakrishnan's opinion. In a reply brief filed in the trial court, the Township simply argued, with little detail, that the affidavit was based on false information and incomplete facts. In its motion for reconsideration, the Township elaborated on its position, asserting that the trial court should have disregarded the affidavit because it allegedly provided no analysis of any medical or other scientific principles that supported the doctor's conclusion. Specifically, the Township asserted that Dr. Ramakrishnan had not presented the foundational evidence required for him to opine on the cause of the L5-S1 disc herniation and the disc bulging at C3-C4. Both below, and on appeal, the Township asserts that Dr. Ramakrishnan's opinion did not comport with the requirements of MRE 702, which provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Dr. Ramakrishnan had the benefit of plaintiff's reported history. He attested that he had reviewed plaintiff's medical records from both before and after the accident. Dr. Ramakrishnan was aware that plaintiff had treated with a chiropractor two years before the accident. The doctor then correlated the nature of the injuries with the fact that plaintiff was struck by a large SUV to reach the conclusion that the auto accident likely caused plaintiff's injures. The Township's challenges to the affidavit go to the weight of Dr. Ramakrishnan's opinion, not its admissibility. Any challenge to the credibility of the expert's opinion, such as the opposing party's disagreement with an expert's opinion or interpretation of the facts, relates to the weight of the testimony, and not its admissibility. *Surman v Surman*, 277 Mich App 287, 309; 745 NW2d 802 (2008). There

was enough information included in the affidavit for the court to conclude that the opinion of a treating spinal surgeon was reliable under MRE 702.

The Township also asserts that plaintiff's injuries did not rise to the level of a serious impairment of an important body function. We conclude that this issue was not properly preserved. A review of the Township's motion for summary disposition and reply brief reveal that the Township did not seek summary disposition on this ground. While the Township gave lip-service to the black letter law interpreting the meaning of a "serious impairment of a body function," it never engaged in any analysis of the factors. Instead, the Township focused on whether Maples's negligence caused the injury. Although the Township may have attempted to present its argument as one concerning the objectively manifested impairment requirement, the issue of causation is distinct from the threshold injury analysis. *Patrick*, 322 Mich App at 615-616. Only in its motion for reconsideration did the Township even attempt to argue that the injuries at issue did not rise to the level of a serious impairment. Even then, the Township engaged in a cursory and conclusory argument. Under these circumstances, any claim that summary disposition should have been granted because plaintiff was unable to establish that his alleged impairments met the threshold has not been properly preserved. In any event, even if we were to exercise our discretion to consider this issue, see *Joe Panian Chevrolet, Inc v Young*, 239 Mich App 227, 233; 608 NW2d 89 (2000) (this Court may address an unpreserved issue "if it is one of law for which all the necessary facts were presented"), the Township has not demonstrated that it was entitled to summary disposition on the basis of this issue.

Under the no-fault act, recovery for noneconomic damages is limited to situations where a plaintiff can show that he suffered "death, serious impairment of body function, or permanent serious disfigurement." MCL 500.3135(1). A "serious impairment of body function" is "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." MCL 500.3135(5). In *McCormick*, 487 Mich at 195, our Supreme Court explained that "[o]n its face, the statutory language provides three prongs that are necessary to establish a 'serious impairment of a body function': (1) an objectively manifested impairment (2) of an important body function that (3) affects the person's general ability to lead his or her normal life." "[T]here is no bright-line rule or checklist to follow in making that evaluation." *Chouman v Home Owners Ins Co*, 293 Mich App 434, 441; 810 NW2d 88 (2011). The analysis is "inherently fact- and circumstance-specific" and "must be conducted on a case-by-case basis." *McCormick*, 487 Mich at 215.

The available record suggests that a question of fact exists regarding whether plaintiff's alleged injuries rose to the level of a serious impairment of an important body function. Regarding the first *McCormick* prong, in *Patrick*, 322 Mich App at 607, this Court explained: "Although mere subjective complaints of pain and suffering are insufficient to show impairment, evidence of a physical basis for that pain and suffering may be introduced to show that the impairment is objectively manifested." Here, plaintiff presented evidence of a physical basis for his pain. Plaintiff provided (1) medical records documenting muscle spasms, swelling, impaired range of motion, and (2) radiographic studies that revealed herniated and bulging discs. In addition, in his June 11, 2020 operative report, Dr. Ramakrishnan noted that plaintiff had intractable low back pain and radiculopathy (nerve damage) following injuries he sustained in a motor vehicle accident. He further explained that the pathology seen on MRI at L5-S1, i.e., the large herniated disc, was correlated with plaintiff's examination and history. Dr. Ramakrishnan's operative note described

-13-

a physical basis for plaintiff's complaints of pain. Thus, at the very least, plaintiff established that a question of fact exists regarding whether his impairment was objectively manifested.

Plaintiff also put forth sufficient evidence to support a claim that his injuries following the accident impacted his ability to lead his normal life. In order to determine that the impaired person's ability to lead his normal life has been affected, this Court compares the person's life before and after the injury. *Nelson v Dubose*, 291 Mich App 496, 499; 806 NW2d 333 (2011). Plaintiff testified that before the accident he was working at the Plymouth Pub. For the several weeks preceding the accident, plaintiff was riding a bike the 12 miles to and from work. Plaintiff explained that as a result of the accident, he sustained injury to his back, neck, hip, and a permanent indentation of his left femur. Nerve damage related to the herniated disc has caused him to experience constant muscle spasms. Before June 21, 2019, plaintiff had never experienced these spasms. Plaintiff admitted that the spasms have calmed down since the surgery, but that they were still triggered when going from a sitting to a standing position. Plaintiff was not able to work and had been, at that moment, deemed 100% disabled. Plaintiff's mobility was restricted, he was not able to ride a bike any longer, and he used a cane to get himself up. Although he dated casually in the past, plaintiff no longer dated. At the time of his deposition, plaintiff lived with his mother, who had "practically been an at-home nurse for him." She prepared meals and helped him get dressed, which she had not done in the past. Plaintiff testified that he went from being an active person to now someone who had to rewrite his life. This testimony created a question of fact whether plaintiff's injuries affected his general ability to lead his normal life. Whether plaintiff's injuries amounted to a serious impairment of a body function was a question of fact that remained to be litigated.

## D. MOTION FOR RECONSIDERATION

In its statement of questions involved, the Township asserts that the trial court abused its discretion when it denied its motion for reconsideration. We disagree. This Court reviews a trial court's decision on a motion for reconsideration for an abuse of discretion. *Woods v SLB Prop Mgt, LLC*, 277 Mich App 622, 629; 750 NW2d 228 (2008). A trial court abuses its discretion when its decision falls outside the range of principled outcomes. *Id.* at 625.

"Generally, and without restricting the discretion of the court, a motion for rehearing or reconsideration which merely presents the same issues ruled on by the court, either expressly or by reasonable implication, will not be granted." MCR 2.119(F)(3). "The moving party must demonstrate a palpable error by which the court and the parties have been misled and show that a different disposition of the motion must result from correction of the error." *Id.* "The trial court has considerable discretion in granting reconsideration to correct mistakes, to preserve judicial economy, and to minimize costs to the parties." *Auto-Owners Ins Co v Compass Healthcare PLC*, 326 Mich App 595, 608; 928 NW2d 726 (2018) (quotation marks and citation omitted). "[A] court has full discretion to decline to consider evidence presented with a motion for reconsideration that could have been presented the first time the issue was argued." *Yachcik v Yachcik*, 319 Mich App 24, 42; 900 NW2d 113 (2017) (quotation marks and citation omitted).

In its motion for reconsideration, the Township asserted that "the trial court's oral opinion did not address whether plaintiff's injuries crossed the Michigan No-Fault threshold, nor did it address whether plaintiff's specific alleged impairments 'resulted from' the accident." First,

contrary to the Township's assertion, the trial court did, albeit inartfully, specifically rule on whether plaintiff's injuries resulted from the accident. Therefore, the Township did not demonstrate a palpable error in this regard.

Regarding the Township's claim that the trial court did not address whether plaintiff's injuries satisfied the serious impairment threshold, we note that the trial court had not previously addressed this issue because it was never asked to do so. In a third-party no-fault action, a plaintiff must establish that his injuries, such as the alleged spinal damage, were caused by the motor vehicle accident. See MCL 500.3135(1). If they are able to do so, a plaintiff must then establish that those injuries amounted to a "serious impairment of body function" as defined by MCL 500.3135(5). In its motion for summary disposition, the Township simply argued that plaintiff's injuries were not caused by the accident. Whether plaintiff's injuries met the serious impairment threshold was raised for the first time in the Township's motion for reconsideration. On a motion for reconsideration, a trial court has the discretion to reject the motion if it merely presents the same issues already decided by the court and a court also has the discretion to decline to consider new evidence and legal theories. *Yoost v Caspari*, 295 Mich App 209, 220; 813 NW2d 783 (2012). There was no indication that the arguments could not have been presented when the motion for summary disposition was initially decided. Accordingly, because the arguments could have been made earlier, but were not, the trial court was free to exercise its discretion to deny reconsideration. The Township has failed to demonstrate that the trial court abused its discretion.

Affirmed.

/s/ Michelle M. Rick
/s/ Douglas B. Shapiro
/s/ Colleen A. O'Brien