*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MARK J. KOLLAR,

      Plaintiff-Appellant,

v

BRIANA SPARKS and JORDAN LEWIS,

      Defendants-Appellees.

UNPUBLISHED
October 26, 2023

No. 364420
Montcalm Circuit Court
LC No. 2021-027867-DC

Before: RICK, P.J., and SHAPIRO and YATES, JJ.

PER CURIAM.

Plaintiff appeals as of right an order revoking his paternity to the child, AJK, under the Revocation of Paternity Act (ROPA), MCL 722.1431 *et seq.* We affirm.

## I. FACTUAL BACKGROUND

This appeal arises out of a child welfare dispute between plaintiff, Mark J. Kollar, and his then-estranged wife, defendant Briana Sparks, regarding Sparks's daughter, AJK. Testimony and evidence established that Kollar had an on-again, off-again relationship with Sparks. Sparks moved in with Kollar in or around March 2020. While living with Kollar, Sparks reconnected with defendant Jordan Lewis, whom she had previously known from school. According to Lewis, Sparks did not initially tell him that she was also with Kollar. She later told him that Kollar was her "sugar daddy."

In July 2020, Sparks accused Kollar of domestic violence. She left him and moved in to live with Lewis. Sparks stated that Kollar knew that she had been seeing Lewis by that time. Sparks became pregnant and moved back in with Kollar in November 2020. Kollar and Sparks married in March 2021, and Sparks gave birth to AJK in April 2021. Two months later, in June 2021, Sparks again left Kollar to live with Lewis. She took AJK with her. Kollar sued for temporary legal and physical custody of AJK that same month. He asserted that Sparks and Lewis were abusing drugs and that AJK was not safe in their care. There was evidence that Sparks and Lewis abused cocaine, Fentanyl, and other drugs. The trial court granted his request for temporary custody.

In July 2021, Sparks accused Lewis of domestic violence and moved back in with Kollar. That same month, the trial court allowed Lewis to intervene in the custody dispute between Sparks and Kollar. Lewis moved to revoke Kollar's paternity under the ROPA. Lewis also separately sued Sparks to establish paternity, but the trial court dismissed that case without prejudice because Sparks was married when AJK was born, meaning that Kollar was presumed to be AJK's father. A DNA test revealed that Lewis was AJK's biological father. A referee held a five-day evidentiary hearing on the motion to revoke paternity, which took place over four months. At the conclusion of the hearing, the referee found that Lewis established that AJK was born out of wedlock. The referee recognized that she could refuse to enter an order determining that AJK had been born out of wedlock, but found that doing so would not be in AJK's best interests. Accordingly, she recommended entry of an order determining that AJK was born out of wedlock.

In July 2022, the trial court entered an order consistent with the referee's recommendation. It further ordered that Lewis's previously filed paternity action be reinstated. Kollar's custody case was thereafter closed. Kollar objected and asked for a de novo hearing, which was held in September 2022. At the hearing, the trial court stated that it had acted, and was acting, with AJK's best interests in mind. It noted that AJK needed finality. The court also went through the various factors under the ROPA and made independent findings on the basis of its review of the record. Among those findings, the court stated as follows:

> I think Mr. Kollar is correct that, really, we do have two primary factors, as it relates to the—well, in this situation, I would really say three factors. And I want the record to reflect I'm looking at MCL 722.1443(4), whether the presumed father is estopped from denying parentage, and again, I would agree . . . that that doesn't apply here, because Mr. Kollar, clearly, does wish to maintain paternity.

> As it relates, then, to Factor B, and the length of time the presumed father was on notice that he might not be the child's father, I find that that clearly indicates that Mr. Kollar, I think he was very hopeful that he was the biological father of this child, but given the whole dynamic of the relationship, and the fact that they didn't marry until shortly before the child's birth, well after conception, and this knowledge, as he testified before me on June 15, 2021 that [Sparks] had come back for a short period of time, she went back to Mr. Lewis' home, so to speak, he was on notice from the very beginning that he might not be this child's father. So I think that's really overwhelming evidence here, in terms of the fact that he did make a decision . . . to pursue custody of the child, but he knew . . . that there was a very strong likelihood that he was not the father, from this Court's findings and perspectives.

> So Factor C, then, is the facts surrounding a presumed father's discovery that he might not be the child's father. And again, I don't find this to be a surprise to Mr. Kollar at all.

> He is indicating—I realize there has been some conflicting testimony about whether or not this was a planned-for pregnancy between M[s]. Sparks and M[r]. Lewis. Mr. Kollar has taken the position that that has not been the case, but yet,

clearly, there is evidence here that this was not a mistake, that this was a child that Mr. Lewis and Ms. Sparks had planned . . . or were actively seeking.

\* \* \*

As it relates to Factor D . . . the nature of the relationship between the child and the presumed or alleged father . . . . There is no question in my mind that [Kollar] loves this child deeply . . . . So again, I find that there is a significant bond there between Mr. Kollar and the minor child.

As it relates to Factor E, the age of the child, again, I am mindful of the fact that this child is very young. Her biological father was introduced to her at a very young age. I am mindful of the fact that he did have some minimal contact with her shortly after birth, but she was certainly in her infancy when some supervised parenting time had initiated . . . .

\* \* \*

As it relates to harm that may result to the child . . . . there are just heart-wrenching cases where . . . . the Supreme Court has reversed adoptive situations, you know, where children were completely and solely bonded to a particular caretaker or home environment . . . Certainly, we want to insulate . . . [AJK] from that[.]

The trial court went on to discuss factors it believed affected the equities between the parties, pursuant to MCL 722.1443(4)(g), as well as other factors it believed appropriate to consider under MCL 722.1443(4)(h). The court stated that it had no doubt that Kollar really did love AJK, but it agreed with the referee's conclusion that he would remain a part of AJK's life as a step-parent. The court observed that the relationship dynamic between Sparks and Kollar was extremely unhealthy and characterized by a clear power imbalance. The court pointed out that Kollar is a licensed attorney who previously represented Sparks in an unrelated criminal proceeding, and noted that "to me, it just does not add up, in terms of this being a healthy, normal, and appropriate relationship." After summarizing its findings on the factors, the court found that it was in AJK's best interests to revoke Kollar's paternity. The court also stated that it was appropriate to reopen the paternity case because the relevant parties to the remaining custody matters were now Sparks and Lewis as AJK's biological parents.

The referee held a custody hearing a few days later in the newly revived paternity case. At the hearing, the parties stated that they had come to an agreement on custody. They agreed that Lewis would have sole physical custody, but they would share legal custody. In November 2022, Lewis moved for entry of a final order in this case. A final order was subsequently entered in December 2022. This appeal followed.

## II. ANALYSIS

### A. EXPERT TESTIMONY

Kollar first argues that the referee erred in several respects when she allowed Angie Sattler, who was an investigator with the Friend of the Court (FOC), to testify as an expert. He also argues that the referee erred by admitting a report drafted by Sattler into evidence. We disagree.

A trial court's qualification of a witness as an expert is reviewed for an abuse of discretion. *Gay v Select Specialty Hosp*, 295 Mich App 284, 290; 813 NW2d 354 (2012). A trial court abuses its discretion when its decision falls outside the range of principled outcomes. *Mitchell v Kalamazoo Anesthesiology, PC*, 321 Mich App 144, 153-154; 908 NW2d 319 (2017). Moreover, "[a]lthough trial courts have considerable discretion in determining whether a witness is qualified to testify as an expert, trial courts must nevertheless accurately apply the law in exercising their discretion." *Gay*, 295 Mich App at 291. This Court reviews de novo whether the trial court properly applied the rules of evidence. *Mitchell*, 321 Mich App at 154.

Kollar primarily contends that Sattler was not experienced enough in paternity matters to testify as an expert in this case. MRE 702 governs the certification of expert witnesses, and provides, in relevant part:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Here, the referee had considerable discretion in determining whether Sattler was qualified to testify as an expert, as well as a duty to ensure that Sattler's testimony met the threshold requirements at every stage of the proceedings. See *Gay*, 295 Mich App at 291.

Sattler testified that she had worked for the FOC for almost nine years. She has specific training in domestic violence, substance abuse, and issues relating to coparenting. Sattler is highly educated, having earned a bachelor's degree and a master's degree, and is a licensed professional counselor. Sattler stated that she had a private therapy practice in addition to her work for the FOC. She conducted custody investigations in 442 cases and had been admitted as an expert on numerous occasions. After hearing her qualifications, Kollar conceded that Sattler was an expert "relative to custody" but asserted that she had not worked on a paternity case and was therefore not qualified to offer any opinions on paternity. The referee disagreed and allowed Sattler to testify as an expert "in child custody investigation," which the referee felt would be helpful to the court in making its paternity determination under the ROPA.

Kollar asserted in the trial court, and continues to assert on appeal, that Sattler had to be an expert on the ROPA in order to testify in this case. However, Kollar cites no authority in support of that claim. It is the function of an expert to supply opinion testimony, which may embrace ultimate issues of fact. *Carson Fischer Potts and Hyman v Hyman*, 220 Mich App 116, 122-123;

-4-

559 NW2d 54 (1996). An expert may not, however, give testimony on the proper interpretation and application of the law because "it is the exclusive responsibility of the trial court to find and interpret the law." *Id*. at 123. Consequently, it is not necessary that an expert like Sattler have expert knowledge about the ROPA in order to testify about facts or offer opinions implicating the ROPA or the field of law encompassing paternity and child custody.

Additionally, the child custody factors stated under MCL 722.23 were relevant to the referee's finding under MCL 722.1443(4) whether it was in AJK's best interests to refuse to enter an order determining that she was born out of wedlock even though Lewis proved that she was born out of wedlock. See *Demski*, 309 Mich App at 432 n 10. The FOC had the authority to aid the trial court in this case by investigating, preparing a report, and making recommendations because a determination that a child was born out of wedlock implicates child custody. MCL 552.502(m); MCL 552.505(1)(g). Accordingly, Sattler's skills, training, and experience in these areas were relevant to determine a fact in issue—the child's best interests—using the best-interest factors stated under MCL 722.23. Moreover, by conceding that Sattler was an expert in that area, Kollar waived any claim that she could not testify as an expert on those areas. See *Grant v AAA Mich/Wisconsin, Inc*, 272 Mich App 142, 148; 724 NW2d 498 (2006) (stating that "[a] party who expressly agrees with an issue in the trial court cannot then take a contrary position on appeal.").

The skills and training involved with investigating and making recommendations on the best interests of a child in a custody dispute were also applicable by analogy to the investigation and recommendation on the best interests of a child in a ROPA action. That Sattler had not yet employed her special skills and training in such an investigation or report was a matter implicating the weight and credibility of her testimony. It had no bearing on whether she could testify as an expert at all. *Surman v Surman*, 277 Mich App 287, 309; 745 NW2d 802 (2008). Under the facts of this case, the trial court's decision to allow Sattler to testify about her investigation and offer an expert opinion about the facts underlying the referee's best-interest findings fell within the range of principled outcomes. See *Mitchell*, 321 Mich App at 153-154.

Even if it had been error for the trial court to allow Sattler to testify as an expert, that error would not warrant relief. An error does not warrant relief unless it appears that the refusal to provide relief appears inconsistent with substantial justice, which generally requires showing that the error denied the complaining party a fair trial. See MCR 2.613(A); *Mitchell*, 321 Mich App at 157-158. Sattler would still have been able to testify as a lay witness about her investigation and could have offered her recommendations to the referee even if she had not been allowed to testify as an expert. See MCL 552.505(1)(g); MRE 701; MRE 704. Additionally, the record showed that the referee independently reviewed the evidence and made her own findings of fact, which led her to conclude that it was not in AJK's best interests to refuse to enter the order determining that AJK had been born out of wedlock. Similarly, the trial court made its own findings of fact on hearing the matter de novo. Considering the evidence presented as a whole in light of the independent findings by the referee and the trial court, Kollar failed to establish any error in admitting Sattler as an expert witness.

Finally, Kollar argues that it was error for the referee to admit Sattler's report into evidence. We agree that the referee should not have admitted Sattler's report. See *Kuebler v Kuebler*, ___ Mich App ___; ___ NW2d ___ (2023) (Docket No. 362488); slip op at 9 (noting that "investigative

and evaluative reports are often found to be inadmissible hearsay."). That error, however, does not warrant relief. Sattler properly testified about her investigation and recommendations at the hearing, and the referee could properly consider Sattler's report even if unadmitted. See MCL 552.505(1)(g); MRE 701; MRE 704. On this record, the error in admitting the report caused little prejudice, and Kollar has not shown entitlement to relief. See MCR 2.613(A); *Mitchell*, 321 Mich App at 157-158.

## B. DUE PROCESS

Kollar next argues that the trial court's handling of the lower court proceedings violated substantive and procedural due process. We disagree.

This Court reviews de novo whether the trial court complied with the requirements of due process. *Bonner v Brighton*, 495 Mich 209, 221; 848 NW2d 380 (2014). This Court also reviews de novo whether the trial court properly interpreted and applied the relevant statutes and court rules. *Franks v Franks*, 330 Mich App 69, 86; 944 NW2d 388 (2019).

The right to due process of law has both a procedural component and a substantive component. *Bonner*, 495 Mich at 225-226. The procedural component protects the right to fair process, and its substantive component bars certain governmental actions regardless of the fairness of the procedures used to implement them. *Id*. When analyzing a claim that a law violates substantive due process, courts first examine the nature of the right. *Id*. at 226-227. If the right is not a fundamental right, the government's interference need only be related to a legitimate governmental interest. *Id*. at 227.

Biological parents have a fundamental right to make decisions about the care, custody, and management of their children. *Troxel v Granville*, 530 US 57, 66; 120 S Ct 2054; 147 L Ed 2d 49 (2000). However, that is not absolute, as the state has a legitimate interest in protecting the moral, emotional, mental, and physical welfare of minors. *Geering v King*, 320 Mich App 182, 188; 906 NW2d 214 (2017). To protect a parent's constitutional right, the state must defer to his or her parenting decisions by presuming that a fit parent's decisions are in the child's best interests. *Hunter v Hunter*, 484 Mich 247, 262; 771 NW2d 694 (2009). In a dispute between fit parents and a third party, the state must also give special weight to the parent's determination of his or her child's best interests. *Id*. When otherwise fit parents have a dispute over the proper care and custody of a child, the state may, consistent with the Constitution, resolve the dispute in the child's best interests. See *Reno v Flores*, 507 US 292, 303-304; 113 S Ct 1439; 123 L Ed 2d 1 (1993) (stating that the best interests of the child is not the sole constitutional criterion for lesser judgments involving the care and custody of children even though it is a venerable, proper, and feasible criterion for resolving custody disputes between parents).

The fundamental right to parent one's children extends to men who sire children out of wedlock. *Stanley v Illinois*, 405 US 645, 651-652; 92 S Ct 1208; 31 L Ed 2d 551 (1972). The Supreme Court of the United States has described the right of a natural father as an "opportunity that no other male possesses to develop a relationship with his offspring." *Michael H v Gerald D*, 491 US 110, 128-129; 109 S Ct 2333; 105 L Ed 2d 91 (1989) (quotation marks and citation omitted). When a child is born into a marriage, however, the natural father's "unique opportunity conflicts with the similarly unique opportunity of the husband of the marriage." *Id*. at 129. In

such cases, whether the state will allow rebuttal of the common-law presumption that a child conceived in, and born to, a marriage is a product of that marriage is a matter of legislative policy, not constitutional law. *Id.*

Although Michigan law continues to recognize a presumption that a child born to a marriage is a product of that marriage, see *Demski*, 309 Mich App at 423-424, Michigan's Legislature has developed an extensive statutory scheme that recognizes the rights of acknowledged fathers, presumed fathers, and alleged fathers. *In re AGD*, 327 Mich App 332, 349; 933 NW2d 751 (2019). The Legislature's decision to provide alleged fathers with a mechanism to establish that a child was born out of wedlock does not infringe on the presumed father's fundamental rights because whether, and to what extent, the state protects marriage at the expense of a biological father's rights are a matter of public policy. *Michael H*, 491 US at 128-129. Moreover, a trial court can, consistent with the Constitution, resolve the competing interests between an alleged father and a presumed father by determining the best interests of the child. *Reno*, 507 US at 303-304.

Kollar relies heavily on this Court's decision in *Grimes v Van Hook-Williams*, 302 Mich App 521; 839 NW2d 237 (2013), for the proposition that Lewis had no right to parenting time as an alleged father. In *Grimes*, however, this Court did not hold that an alleged father has no rights whatsoever. It instead held that an alleged father had to comply with the requirements of the ROPA to establish that the child was born out of wedlock and that the standing requirements of that act did not violate substantive due process because an alleged father did not have a fundamental right to commence a paternity action, request custody, or request parenting time. *Id.* at 531-532. Regardless, an alleged father has those rights provided to him by statute. Because this case began as a custody dispute and Lewis alleged facts that, if proved true, established that he had the right to have AJK declared to have been born out of wedlock, the trial court could exercise its discretion to act in AJK's best interests by ordering Lewis to have parenting time under MCL 722.27(1)(b). See, e.g., *Demski*, 309 Mich App at 443-444 (recognizing that a revocation of paternity action, which includes a request for filiation, custody, and parenting time, is a custody dispute subject to the child custody act).

On appeal, Kollar asserts that the trial court's decision to provide Lewis with parenting time violated his right to due process. As this Court has recognized, the Legislature has given trial courts broad authority to order parenting time consistent with the best interests of the child when a custody dispute arises between parents, agencies, or even third parties. See *id.* at 440. In such cases, the trial court's concern is to order parenting time consistent with the child's best interests. *Id.*, citing MCL 722.27(1). To be sure, in a dispute between fit parents and a third party, the state must give special weight to the parent's determination of his or her child's best interests, see *Hunter*, 484 Mich at 262. However, the state does not have to give special weight to a decision by a presumed father over that of an alleged father because both men have a claim to parent the child. See *Michael H*, 491 US at 129 (recognizing that a presumed father and an alleged father both have a unique claim to parent the child and stating that the resolution of such disputes is a matter of public policy governed by state law). Consequently, this state's statutory scheme for resolving which of two men will be deemed a child's father does not violate a fundamental right held by either an alleged father or a presumed father.

Kollar also suggests that the trial court violated his right to due process by giving Lewis parenting time before it resolved whether AJK was born out of wedlock. Kollar filed the custody action and later stipulated to allowing Lewis to intervene (so that he could move to revoke Kollar's paternity) as permitted under MCL 722.1443(1). The record established that AJK could not have been conceived during the term of the marriage, and there was a DNA test that conclusively established that Lewis was AJK's biological father. That evidence showed a very high likelihood that Lewis would be able to establish the right to a determination that AJK was born out of wedlock. See MCL 722.1441(3)(c) (giving an alleged father standing to sue for a determination that a child was born out of wedlock if he can show that the child was conceived when the mother was not married). The parties understood that the primary question would be whether it was in AJK's best interests to refuse to enter that order. See MCL 722.1443(4). On the basis of the evidence and the circumstances surrounding Kollar's original complaint for custody and Lewis's intervention, the trial court had the authority to enter an order allowing Lewis to have interim parenting time pending resolution of the dispute, if it found that it was in AJK's best interests to have parenting time with Lewis. See MCL 722.27(1)(b).

Kollar also claims that the trial court violated his right to procedural due process involving parenting time in several ways. He claims, for example, that the referee held an evidentiary hearing to determine whether to expand Lewis's parenting time without giving him notice. At the hearing, Kollar recognized that the referee was holding a hearing on whether to expand parenting time. He complained that the referee was putting the "cart . . . way in front of the horse" by failing to first hold an evidentiary hearing to determine whether Lewis was entitled to parenting time as a third party. Kollar does not acknowledge that he participated in the hearing on September 1, 2021, at which the trial court determined that Lewis was AJK's biological father and ordered that Lewis should have supervised parenting time. He also ignores the fact that the trial court entered an order consistent with that ruling a few days later. The record showed that Lewis actually moved for expanded parenting time on the basis of changed circumstances, which included that he had been deprived of the parenting time already ordered. Lewis also properly noticed the hearing.

The record demonstrates that Kollar was given notice and an opportunity to be heard on the issues of parenting time at every stage of the proceeding. Kollar complains that the trial court continuously deferred to Lewis as a "biological father" and granted him preferential treatment at Kollar's expense during the resolution of specific parenting-time disputes. His complaint does not establish a violation of due process. Lewis had quite limited, supervised parenting time during the pendency of the revocation hearing. The record showed that the trial court repeatedly tried to balance the competing interests of the parties in light of AJK's best interests. Kollar's mere disagreement with the trial court's rulings on parenting time does not establish that the trial court violated due process; Kollar had notice and a meaningful opportunity to be heard, which is all that was required to satisfy due process. *Bonner*, 495 Mich at 235.

Kollar next complains that the trial court violated his right to due process because it had no authority to close the custody case after it entered the order determining that AJK had been born out of wedlock. Rather, in Kollar's view, the trial court had to keep that case open so that he would have standing to intervene in the subsequent custody dispute between Lewis and Sparks and would have the ability to delay a final custody determination pending his appeal in this case. Kollar also complains that the trial court entered an order closing the case on July 28, 2022, without giving him notice. Kollar's claims do not establish a violation of due process.

The original action involved a complaint for temporary custody by Kollar against Sparks. After Lewis intervened and Sparks and Kollar reconciled, the sole issue was whether AJK was born out of wedlock. Once the trial court entered an order determining that AJK was born out of wedlock, the presumption in favor of Kollar's parentage was rebutted and Kollar ceased to be AJK's legal father. See *In re Miller*, 322 Mich App 497, 504-505; 912 NW2d 872 (2018). After that determination, Lewis had standing to seek a declaration of paternity under The Paternity Act, MCL 722.711 *et seq*. See *id*. at 504. Although the trial court had the authority to continue the custody case and enter orders concerning custody and parenting time in that case, see *Demski*, 309 Mich App at 438-441, contrary to Kollar's contention, there is no provision in the ROPA that requires a trial court to do so. Because the trial court resolved the paternity dispute and Kollar ceased to be AJK's legal father after that resolution, there was no basis for continuing the underlying custody dispute between Kollar and Sparks. Moreover, entering a final order and closing a case does not limit this Court's authority to grant relief on appeal from the order determining that AJK was born out of wedlock and closing the case. See MCR 7.216.

As for the purported lack of notice on the order entered July 28, 2022, the record shows that that order was consistent with the order that the trial court signed on July 25, 2022, and which was entered on July 26, 2022. It is undisputed that Kollar had notice of that order because he requested a de novo hearing from that order. The trial court ultimately considered whether it should close the case at the de novo hearing in September 2022, and Kollar had a meaningful opportunity to express his views on that decision at the hearing. Kollar has also cited no authority for the proposition he has a right to delay resolution of the remaining custody and parenting-time dispute between Sparks and Lewis pending his appeal. Consequently, Kollar has not demonstrated that the trial court violated due process by closing the underlying custody case and reviving the paternity action.

Kollar next complains that the trial court "trampled" on his substantive and procedural due-process rights at the de novo hearing by refusing to allow him to present new witnesses. The trial court had an obligation to hold a de novo hearing at which the parties may present new evidence, subject to certain limitations. See MCL 552.507(4) and (5); MCR 3.215(F). On appeal, Kollar states that the trial court should have taken evidence from two CPS investigators and Lewis about a CPS referral that occurred after the referee concluded the hearing on the revocation of paternity. He maintained that the circumstances of that CPS referral were relevant to whether the court should revoke his paternity. The right to a de novo hearing does not include a right to reopen the proofs to include anything and everything that the party feels might be pertinent. Rather, the trial court had the authority to limit the new evidence to evidence involving findings of fact to which Kollar objected. See MCR 3.215(F)(2)(a). By failing to identify whether, and to what extent, the new witnesses would have offered testimony on a finding to which he objected, Kollar abandoned any claim that the trial court erred when it refused to allow him to again question Lewis or to present testimony by two additional CPS investigators, or any other witness. See *Martin v Martin*, 331 Mich App 224, 243-244; 952 NW2d 530 (2020).

Finally, Kollar asserts that the trial court was biased against him, which amounted to a violation of due process. Every litigant has a due-process right to an unbiased and impartial decision-maker. *Cain v Mich Dep't of Corrections*, 451 Mich 470, 497; 548 NW2d 210 (1996). "A trial judge is presumed unbiased, and the party asserting otherwise has the heavy burden of overcoming the presumption." *Mitchell v Mitchell*, 296 Mich App 513, 523; 823 NW2d 153

-9-

(2012). Kollar does not make any meaningful effort to establish that the trial court held an actual bias or that the trial court's decisions were so one-sided that they demonstrated a deep-seated favoritism or antagonism. See *In re Contempt of Henry*, 282 Mich App 656, 680; 765 NW2d 44 (2009). Rather, he cites the trial court's explanations for making certain decisions with which he disagrees and asserts that those disagreements establish bias. The mere fact that the trial court ruled against Kollar does not establish bias. See *id*. Accordingly, Kollar has not shown that the trial court infringed upon his right to substantive or procedural due process.

## C. SANCTIONS

For his last claim of error, Kollar argues that the trial court erred when it refused to consider his request for sanctions against Lewis's trial lawyer, David A. Mierendorf, for purportedly making numerous misrepresentations in an emergency motion to place AJK with Lewis after CPS began investigating Sparks and Kollar for possible abuse or neglect.

Kollar argues that the trial court erred when it refused to order sanctions, but he does not explain the nature of the error. Kollar cites the black letter law governing an award of sanctions, but he offers no meaningful analysis about how that law applied to the facts of this case. He also does not discuss the specific allegations against Mierendorf, the procedural posture of the motion about which he complains, the evidence about the CPS investigation that was adduced at the de novo hearing, or the trial court's comments about the investigator's testimony at the hearing, which strongly suggested that the trial court did not agree that Mierendorf's motion was frivolous. On this record, we conclude that Kollar abandoned this claim of error. See *Martin*, 331 Mich App at 243-244.

## III. CONCLUSION

Kollar has not identified any errors made by the trial court that warrant relief. Accordingly, we affirm.

/s/ Michelle M. Rick
/s/ Douglas B. Shapiro
/s/ Christopher P. Yates